112 So.2d 864 (1959)
Archie Bruce CAMERON and Wesley Pless, Appellants,
v.
STATE of Florida, Appellee.
No. A-230.
District Court of Appeal of Florida. First District.
May 12, 1959.
Rehearing Denied May 28, 1959.
On Motion to Strike Petition for Writ of Certiorari June 9, 1959.
*866 Arthur T. Boone, Jacksonville, for appellants.
Richard W. Ervin, Atty. Gen., and David U. Tumin and Eugene P. Spellman, Asst. Attys. Gen., for appellee.
STURGIS, Chief Judge.
This is an appeal from a judgment of conviction and sentence rendered by the Duval County Criminal Court of Record.
The defendants were jointly charged in and convicted under a two count information; first, with breaking and entering with intent to commit a felony, and secondly, with grand larceny. Each defendant was sentenced to serve a term of seven years at Raiford as a result of their conviction under count one. Passing of sentence under count two was deferred from day to day and term to term until finally disposed of, jurisdiction being expressly reserved for that purpose.
The principal question urged on this appeal concerns the trial court's denial of defendants' motion to suppress certain evidence which was subsequently introduced at the trial and identified as property stolen from a store in Duval County. The subject evidence was located and seized by law enforcement officials under circumstances hereinafter related.
The defendants were seen by an officer of the State Highway Patrol as they drove through St. Augustine around noon on the morning of August 22, 1957, in a 1957 Ford automobile bearing a Wisconsin license tag. Their unshaven and unkempt appearance aroused the officer's suspicion. Being off duty at the time and driving with his family in their private car, the officer took no steps to apprehend the defendants. Later, however at around 4:00 p.m. on the same day, the defendants were again seen by the same patrolman, then on duty, as they drove along highway AIA some six miles south of St. Augustine, whereupon the officer determined to "check them out." It is undisputed that the defendants were violating no traffic regulation or otherwise conducting themselves in any unlawful manner. The patrol officer admitted that his sole cause for stopping them was the fact that his suspicion had been aroused by their physical appearance; not because they were violating the law or because of any information indicating that either had committed or was committing any crime.
After stopping the car at that time being driven by Cameron, the officer checked the driver's license issued by the State of Wisconsin and found it to be in order. Upon *867 being informed by Cameron that he owned the car, the officer requested that he be permitted to examine the registration card of the automobile, to which Cameron asserted that he had none for the reason that the State of Wisconsin issued no such paper to automobile owners. In the course of these happenings the officer, by his unobstructed view of the inside of the automobile from his position on the outside, observed that the radio and heater had been removed and saw certain articles, of which more later. Upon inquiring as to the whereabouts of the heater and radio, Cameron stated that he had "gone broke" and pawned them.
These circumstances sharpened the officer's suspicions to the extent that he twice radioed his headquarters to inquire whether there was any information there concerning the automobile or its occupants. He received a negative response, but nevertheless placed both occupants under arrest. While awaiting the arrival of assistance the patrol officer opened and searched the glove compartment in an effort to locate some evidence of ownership.
During the night, after the defendants had been arrested and incarcerated and the car impounded, the patrol officer became advised that a Wisconsin warrant was outstanding against Cameron for theft of the automobile. On the following day formal steps were taken to hold him thereunder. Later in the day the officer conducted a search of the automobile, at which time he removed the property which was identified as having been taken incident to a robbery in this state. Cameron and Pless were delivered to Duval County authorities to face the charges out of which this appeal arose.
Testimony establishing the foregoing facts, together with those hereinafter recited, was received by the trial court in the absence of the jury and resulted in a denial of defendants' motion to suppress. Defendants' objection to introduction of the seized property was likewise overruled and the State was permitted to place it before the jury. These rulings constitute the primary grounds of appeal.
We recognize that law enforcement officers are not authorized to arrest without warrant one who is lawfully traveling a public way and take him into custody on nothing more than a bare suspicion that he has, or might have violated the law. Kersey v. State, Fla. 1952, 58 So.2d 155. We also recognize that if the existing facts do not justify the arrest, it matters not that a search and seizure made as an incident to that arrest produces ample evidence to support what at the time of the arrest was nothing more than a mere suspicion; that an illegal arrest and search cannot be made legal by the fruit it produces. Collins v. State, Fla. 1952, 65 So.2d 61; Brown v. State, Fla. 1952, 62 So.2d 348. See also Garske v. United States, 8 Cir., 1 F.2d 620; Cornelius on Search and Seizure, 2nd Ed., § 31, p. 86. We are also cognizant of and agree with the proposition stated in a recent decision by Mr. Justice Thornal: "If government under law even approximates the great principles that it is supposed to comprehend, we are necessarily impelled to the conclusion that the rascal and the chiseler, the thief and the `con-man' are as much entitled to a fair trial as are those ultimately found to be innocent." Shargaa v. State, Fla. 1958, 102 So.2d 814, 817.
The State contends that the defendant Pless is not in a position to object to the evidence obtained by the search for the reason that he was merely a passenger or hitchhiker in an automobile which he did not own, possess or control. This contention is based upon the principle announced by our Supreme Court in Chacon v. State, Fla. 1957, 102 So.2d 578, in which it was held that two of the defendants there were in no position to question the validity of a search warrant since they neither owned nor had the lawful right to possession of the premises described therein.
While the exact question does not appear to have been heretofore considered *868 or passed upon by our Supreme Court, it is clear from a review of other authorities that the constitutional guarantee to be secure against unreasonable searches and seizures accrues only to the persons in whom is vested the lawful right of possession of the premises searched, and does not extend to others who might incidentally be on the premises at the time the search is made. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409; United States v. Pepe, 2 Cir., 247 F.2d 838; Lovette v. United States, 5 Cir., 230 F.2d 263; Connolly v. Medalie, 2 Cir., 58 F.2d 629; United States v. Messina, 2 Cir., 36 F.2d 699.
Since defendant Pless was neither the owner nor had the lawful right to possession of the automobile which was the subject of the search resulting in seizure of the stolen property, he was not in position to object to the search and seizure. This would be the case even if the search and seizure had been unlawful as to Cameron. The evidence seized was therefore admissible in the trial of the charges against him.
At the conclusion of the trial, over defendant Pless' objection, the court instructed the jury that where it is shown beyond a reasonable doubt that a building has been entered and property stolen therefrom, and soon thereafter the property is found in the possession of the persons charged with entering the building with intent to steal, such possession unexplained may warrant the inference that such persons not only stole the goods, but that they broke and entered the building with intent to steal them. Defendant Pless contends that such charge was erroneous for the reason that the court had previously overruled his motion to suppress the evidence upon a finding that he was not in possession of the automobile, and therefore had no right to object to the unlawful search which disclosed the stolen property. Pless urges that if as a matter of law he was not in possession of the automobile, there were no facts upon which the jury could have lawfully concluded that he was in possession of the stolen property found therein so as to justify the court's charge regarding the inference of guilt which arises from such possession. At first blush, such contention appears to have merit.
We are of the view, however, that such argument ignores the difference in the types of possession involved in the court's ruling on the motion to suppress, and in the instruction to the jury. The former dealt exclusively with the lawful right to possession of the premises searched, while the latter dealt with possession of the property itself. Without detailing the evidence which showed a constant association between Pless and Cameron commencing during the day on which the store was broken into and entered, carrying through the following afternoon when they were apprehended by the highway patrolman, we are of the view there was ample evidence from which the jury could have concluded as a fact that both Pless and Cameron were in the exclusive possession of the stolen goods at the time of their detention by the highway patrolman. This being so, the charge of the court was proper and not amenable to the attack made upon it.
Finding no reversible error as to Pless, his conviction is affirmed. We will hereafter consider a question concerning deferment of his sentence on the second count of the information, of which he stands convicted.
Considerations apart from those hereinabove mentioned lead us to conclude that the evidence before the trial judge on the issues presented by the motions to suppress the evidence was altogether sufficient to support the trial judge's finding  implicit in the denial of the motion  that the arresting officer had probable cause, at the time he first apprehended Cameron and Pless, to believe they were committing a crime in his presence, specifically, *869 theft of the automobile in which they were riding. We hold, therefore, that their arrest was lawful ab initio and its fruits admissible in evidence against both of them. We will later discuss these conclusions in detail.
We are also convinced that the evidence before the trial judge on the motion to suppress unquestionably permits the conclusion that the search and seizure was not made at the time of or in relation to the initial arrest, but was in fact made at a subsequent time and place and under facts and circumstances totally unrelated to and independent of the initial arrest; that is, that it was made only after defendant Cameron was known to be a fugitive from justice and was being held on charges of auto theft and grand larceny emanating in Wisconsin. Testing the trial judge's action in the light of the evidence as to happenings subsequent to the initial arrest, it is clear that he was further warranted to conclude  and his denial of the motion to suppress bears the inference that he did so conclude  that the subsequent search and seizure was lawful in all respects.
We are also convinced that the evidence before the trial judge on the motion to suppress not only permits but compels the conclusion that at the time the defendants were first apprehended Cameron had changed his original relation as lawful bailee of the automobile to that of the thief of the automobile, and thus became divested of any rights in it, possessory or otherwise, with the result that he enjoyed no immunity against the search and seizure, however arbitrary it might have been. This, we feel, is a separate and inescapable proper basis for the trial court's denial of the motion to suppress.
On a motion to suppress evidence the trial judge is trier of both law and fact. His conclusions come to this court clothed with a presumption of correctness and in testing the accuracy of his conclusions on questions of fact we should interpret the evidence and all reasonable inferences and deductions capable of being drawn therefrom in the light most favorable to sustain those conclusions.
The appellants contend that the testimony in this regard is inadequate. However, they present a strained interpretation of the weight, character and sufficiency of the evidence in question, emphasizing the negative rather than the positive evidence, insisting that the fact that the defendants' appearances aroused the officer's suspicion was insufficient to warrant his intercepting them on the highway. These facts, standing alone, might very well be of some consequence if, first, an officer has to have some basis, other than his arbitrary will or intention, as a predicate in law for his act in intercepting an automobile and checking the driver's license, or, secondly, if the right of arrest depends entirely on factors happening in point of time prior to such interception. Such, however, is not the law.
Members of the Florida Highway Patrol are vested with authority under F.S. Section 321.05(1), F.S.A. "to require the drivers of vehicles to stop and exhibit their drivers' licenses, registration cards or documents required by law to be carried by such vehicles." And F.S.Section 322.15, F.S.A. provides:
"Every licensee shall have his operator's or chauffeur's license in his immediate possession at all times when operating a motor vehicle and shall display the same, upon demand of a patrol officer, justice of the peace, a peace officer, or a field deputy or inspector of the department."
The officer's motive for acting under the statute is immaterial, hence the fact that he is suspicious that the driver of a particular automobile may be committing a crime neither adds to nor detracts from his authority to stop the automobile and check the driver's license.
*870 The question in the case on appeal, as in all cases where there is an arrest and search and seizure following upon what was initially nothing more than the naked right of the officer to make a check of the driver's license, is whether in the course of such check there came to his attention facts of such nature as to cause the officer, regardless of or in supplementation of what his prior suspicions might have been, reasonably to believe that a crime was being committed in his presence. If so, there is a lawful basis for the arrest and for the search and seizure from the automobile of evidence relating to a crime actually committed. The officer's claim of good faith is obviously supported to a material extent by the subsequent discovery of evidence showing that the law was then and there being violated. United States v. Vatune, D.C.Cal., 292 F. 497.
The Florida Supreme Court, in Church v. State, 151 Fla. 24, 9 So.2d 164, 166, speaking through Terrell, J., points out that it is the home, as distinguished from other ownerships of property, that the Fourth Amendment to the Federal Constitution and Section 22 of the Declaration of Rights, Constitution of Florida, F.S.A., are primarily designed to protect:
"The Fourth Amendment to the Federal Constitution prohibiting unreasonable searches and seizures stems from the principle of the common law securing to every citizen in his home and office immunity from interference by the State and the protection of his person, property, and papers from legal process. Prior to the Revolution, the liberty of the citizen in the colonies was harassed by writs of assistance in the hands of revenue officers to search designated places for smuggled goods, persons, and papers. In this country and England, executive warrants were issued to search private houses to recover books and papers that might be used as evidence against the owner. The practice was the remnant of a jurisprudence that had its roots in prerogative as against democratic power and was often accompanied by ruthless intrusion of governmental agents into private homes and effects to secure evidence for political prosecutions. These writs are exasperating to the citizen, contrary to every democratic impulse and were considered the most flagrant examples of arbitrary power known to the people, hence the language of the Fourth Amendment which was repeated in all the State Constitutions. Section Twenty-two, the Declaration of Rights, Constitution of Florida. May's Constitutional History of England, Chapter Eleven, contains an interesting discussion of the question.
"It will thus be seen that the primary purpose of the amendment was to protect personal liberty and private property and to put a stop to invasion of the home and its secret precincts by the government or its agents. The amendment however only inhibited `unreasonable' searches and seizures. It contemplated that personal liberty and private property might be forfeited and where such was the case, the amendment offered no immunity. It has never been permitted to be invoked for the purpose of protecting one in the commission of a crime and certainly under the circumstances recited in the affidavit in this case, it will not be invoked to inhibit a search to ascertain whether or not the law is being violated. There is no suggestion here of an invasion of the home, the place to be searched being one alleged to be used for conducting an unlawful business."
The motion to suppress in this case was made in the course of the testimony of Mr. Siprell, the highway patrolman who made the arrest, and the search and seizure consequent thereon. The trial judge excused the jury and heard the testimony of the officer and of defendant Cameron, then denied the motion.
*871 Before discussing the details of that testimony, it is well to note that while highway patrolmen are not endowed with occult powers they are specially trained to search out and detect criminals traveling the public highways. In this age of rapid transit by automotion this special training must be coupled with ability under the law to give it practical effect in the field of law enforcement if the lawabiding citizen is to have a fit weapon with which to protect his rights against the criminal element, one equal in muscle to those respected safeguards, under the law, that are designed to protect the citizen, lawabiding or otherwise, against despotic interference with personal rights and privileges. It must be assumed that the learned trial judge evaluated the testimony in that light when denying the motion to suppress. The following language in the leading case of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, which case by F.S. Section 933.19, F.S.A. was adopted as the statute law of Florida applicable to searches and seizures made as an incident to the enforcement of laws relative to the hauling of contraband, is appropriate to our consideration of this appeal in that it recognizes, as the courts have long recognized, the practical distinction between a search of property that is readily movable out of the jurisdiction and that which is not:
"* * * the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." 267 U.S. at page 153, 45 S.Ct. at page 285.
The immunity against unlawful searches and seizures is not available to one who does not rightfully possess the property searched. See 79 C.J.S. Searches and Seizures § 52, p. 812 and cases cited under footnote 77. This is important to a proper determination of this appeal because, as we interpret the evidence, it unequivocally reflects that Cameron did not rightfully possess or have the right of possession of the automobile at any of the critical times involved.
That part of the testimony before the trial judge on the motion to suppress and which, if believed by him (and his denial of the motion to suppress indicates he did so believe), is sufficient to support that action in so far as defendant Cameron is concerned, may be summarized as follows:
Patrolman Siprell testified substantially as follows: He had seven years experience as a trooper with the Florida Highway Patrol. On the morning before the afternoon when he arrested the defendants, who were riding in a 1957 Fairlane Ford with a Wisconsin license tag, his attention was attracted to them because their clothes were dirty and they needed a shave. At that time he made a note of the tag number of the automobile.
Later in the day he saw the defendants and stopped the automobile in which they were riding in order to "check the driver's license and check the registration on the car and check the ownership." Cameron, the driver, produced a Wisconsin driver's license and stated "it was his car." It was daylight and while standing outside of the car the patrolman could and did see that the radio and heater had been removed. From that position he also saw a burlap bag of some clothes lying on the back seat and a five-gallon oil drum, a rubber hose and tools lying on the floor back of the driver. The tools then seen consisted of an electric drill, a hammer, two bars, a keyhole saw, and a pipe wrench, all lying in open view on the floor board.
*872 In response to patrolman Siprell's question, defendant Cameron stated these were carpenter's tools. Mr. Siprell noted the absence of a handsaw, level, and square among the tools and inquired of Cameron where they were. Cameron made some undisclosed comment in reply.
A county officer later appeared on the scene and Mr. Siprell then inspected the glove compartment of the car in an effort to find evidence of ownership, but made no other search at that time. He testified that he believed the car was stolen, saying: "I was satisfied in my mind it was stolen." This belief was the product, of course, of the physical evidence seen by him, his conversation with the defendants, and his experience and training as a police officer. On the basis of that belief he took the defendants in custody, delivered them into the hands of the sheriff at the county jail in St. Augustine, and had the car placed under lock and key in a garage in that city. He testified that up to that time the only search was to look in the glove compartment for evidence of ownership, and that this was after the absence of the radio and heater had been observed; also, that the objects heretofore mentioned were in open view and seen by him before he looked in the glove compartment, where none of those objects were located. He testified that he did not open the trunk until the next day.
After lodging the defendants in the county jail at St. Augustine the patrolman made inquiry and learned through the Federal Bureau of Investigation that a Wisconsin warrant was outstanding for the arrest of Cameron on charges of auto theft and larceny. On the next day he took steps that resulted in Cameron being formally held under arrest on the Wisconsin charge. It was not until then, according to Mr. Siprell, that he "went to the garage and got the stuff out and took pictures of it which I had in my possession up to this time," consisting of the following personality: a hacksaw found in the trunk, a brace and bit found under the front seat; an ice pick, a glass cutter, two pairs of gloves, and a roll of adhesive tape found in the glove compartment; one long and two small bars, a big ball-peen hammer, a keyhole saw, an electric drill, and a pipe wrench found on the floor board in the back of the car. It is his testimony that up to that time no one had searched the automobile other than in the glove compartment for the purpose heretofore mentioned.
The defendant Cameron testified in substance: That he rented the car from Hertz U-Drive-It about a month prior to the arrest. He admitted that he told officer Siprell that he took the radio and heater out and sold them. The following is an excerpt from the cross-examination of defendant Cameron:
"Q. You had no authority to take the radio out of the car? A. That is true.
"Q. Didn't you tell Officer Siprell it was your automobile? A. I said that it was in my custody.
"Q. My question was, didn't you tell him it was your automobile? You can answer that yes or no, I believe. A. Yes, I did.
* * * * * *
"Q. Do you know how much you paid Hertz U-Drive-It to rent the car? A. No.
"Q. You never had the permission of the company to bring it to Florida? A. No.
"Q. You never had the permission to bring it across the state line, did you? A. No."
The foregoing summary of the testimony of Patrolman Siprell and defendant Cameron does not purport to reflect or attempt to reconcile any of the inconsistencies or contradictions found in the testimony of either, it being the prerogative of the trial judge to perform that function. Its purpose is to demonstrate the presence of evidence *873 which the trial judge was entitled to believe as a basis for his denial of the motion to suppress. It seems apparent from Cameron's testimony alone that whatever possessory rights he enjoyed when he rented the automobile had been efficiently, effectively and conclusively terminated by his unauthorized sale of the radio and heater, and that this happened prior to the time he was intercepted on the highway. By his own admission, therefore, he had lost the right of custody, even though it be assumed the bailment was originally contemplated to continue indefinitely. His wrongful possession affords no basis for his claim of immunity against the search and seizure. It follows that even if we also assume, per argumenti, that the officer did or did not have probable cause for the arrest, the seized evidence is nevertheless admissible.
As a necessary and proper evolution of the living law to meet the changing needs of society, the modern trend of authority is to narrow the concept of immunity against searches and seizures when it involves a motor vehicle used as an aid to the commission of crimes, whether in transporting the criminal or the fruit of the crime. This trend is reflected by the acceptance of less compelling facts and circumstances than formerly required to constitute "probable cause" for an arrest of the driver or occupant, or for search of the vehicle and seizure of property found therein without supporting warrants.
Thus in Pflegl v. State, Fla. 1957, 93 So.2d 75, our Supreme Court, albeit by a split decision, affirmed a conviction in which the appellant posed the propriety (1) of his arrest without warrant, and (2) of the search of his apartment pursuant to a search warrant that issued on the basis of information that was developed only as a consequence of a search of his automobile, also without warrant therefor, made at the time of the arrest. The search of the automobile disclosed automobile tires in the truck that were later identified as having been burglarized from a filling station long prior to the arrest, but which had not been reported until the day following the arrest. At that time the victim of the burglary furnished a list of other missing articles. Using this information, a search warrant was then obtained to search appellant's apartment, and that search produced some of the listed articles that were received in evidence on the trial over defendant's objection. The facts upon which the arrest was made in that case were: There had been a series of recent filling station robberies in the county and reports of several adding machines having been recently stolen. At 5:45 a.m. the arresting officers, who were cruising in their police car, were informed by a passing motorist that he had just seen a man wearing gloves get out of a described automobile and walk toward a filling station, carrying a crowbar in his hands. They proceeded to the scene and as they were arriving observed an automobile as described to them leave the curb and proceed up the street in a lawful manner. They stopped the car, required the driver to get out, searched him for weapons, observed a glove hanging out of his pocket and, looking through the car window, observed an adding machine on the seat, partially covered by clothing. Appellant was immediately arrested, according to one of the officers "on suspicion, investigation and suspicion of the person pending investigation of B and E and grand larceny." He and his automobile were forthwith searched and the stolen tires found and seized. On the basis of that testimony the trial court denied motions (1) to suppress the evidence flowing from search of the automobile, (2) to quash the search warrant for search of the apartment, and (3) to suppress the evidence seized thereunder, and on appeal the conviction was affirmed.
It seems evident that if the facts and circumstances in the Pflegl case are sufficient to show "probable cause" supporting *874 that arrest, the search of the automobile, the seizure of the tires therefrom without warrant, and a basis for the search warrant covering his residence, then the facts in the case on appeal are unquestionably adequate to support the arrest, search and seizure in question.
The motion to suppress the evidence was properly denied as to Cameron, as well as to Pless.
Our disposition of this appeal requires two further points to be considered.
The defendants were represented at trial by common counsel, and neither chose to testify in his own behalf. The record reveals that when the one defense witness was called to the stand to testify the court announced: "Let the record show the witness is called in behalf of the defendant Wesley Pless." According to the testimony adduced by this witness he was with both defendants at a place many miles from the scene of the crime at the time it was shown to have been committed. His testimony was obviously intended to refute that offered by witnesses for the State, which identified the defendants as being in close proximity to the scene of the crime at the time it was committed. Had the witness' testimony been believed by the jury, it would necessarily have exonerated both defendants. After the State and defense had rested their respective cases the trial court announced: "All right, I am going to give the State the opening and closing argument * * *" This ruling is assigned as error.
In fairness to the trial court, we note at the outset that its ruling accords with the clear holding by our Supreme Court in Fuller v. State, 159 Fla. 200, 31 So.2d 259, which we followed in our recent decision in Carter v. State, Fla.App. 1958, 101 So.2d 911, by which we held a defendant was properly denied opening and closing argument under F.S.A. Section 918.09, F.S.A., when testimony offered by a witness for a co-defendant, called by common counsel, was intentionally and patently beneficial to both defendants. Our Supreme Court, however, in granting certiorari in the Carter case (cited in that court as Faulk v. State, Fla., 104 So.2d 519, 523), said:
"We do not feel justified in engrafting upon this statute additional conditions which would preclude joint defendants from selecting joint counsel or which would enable one defendant, if he is so minded, to call a witness in his own behalf and thereby deprive a co-defendant of the right to open and close merely because the testimony of the witness called by the one is of benefit to the other. If these additional requirements are to be added they will necessarily have to come from the Legislature rather than from this court. When the State elects to place two or more defendants on trial collectively, it cannot thereby deprive a particular defendant of the privilege given by the subject statute even though a co-defendant elects to waive the privilege by offering testimony other than his own and even though the defendants are represented by common counsel. The fact that one defendant might offer testimony that could benefit another is the risk that the state assumes when it elects to charge and try two or more defendants collectively."
It is clear that under our Supreme Court's most recent expression on the principle involved, the trial court in the instant case denied defendant Cameron his right under F.S.A. Sec. 918.09, F.S.A., to open and close the argument to the jury, and in only that respect committed reversible error.
Finally, after entry of the verdict of guilty on both counts charged in the information, the trial court entered judgment thereon and sentenced each defendant to a term of seven years in the State Prison under count one. It was further *875 ordered that: "* * * the passing of sentence upon the second count of the information herein be deferred from day to day and term to term until finally disposed of, and the Court herein expressly reserves jurisdiction of this cause to impose sentence at a later date as the Court may deem advisable." As to this portion of the subject judgment, suffice it to say that in our decision in the recent case of Bateh v. State, Fla.App. 1958, 101 So.2d 869, we held that a trial court is without authority to defer the imposition of sentence for an indefinite period after a conviction and judgment of guilt. The defendant Pless should be presented to the trial court and sentenced on the second count of the information.
For the reasons stated, the judgment of conviction is reversed as to defendant Cameron and a new trial ordered; and the judgment of conviction is affirmed as to defendant Pless, with directions that he be sentenced on the second count of which he stands convicted. So much of the trial court's order as purports to withhold sentence is quashed.
Affirmed in part and reversed in part.
CARROLL, DONALD K., J., concurs and WIGGINTON, J., dissents.

On Petition for Rehearing
PER CURIAM.
Petition denied.
STURGIS, C.J., and CARROLL, DONALD, J., concur.
WIGGINTON, Judge (dissenting.)
I most respectfully suggest that the petition for rehearing is well founded and should be granted upon the grounds and for the reasons so ably stated in the majority opinion.

On Motion to Strike the Notice of Intention to Petition the Supreme Court for Writ of Certiorari
PER CURIAM.
It appearing that appellants failed within the time prescribed by Florida Appellate Rule 4.5(c) (6), 31 F.S.A., to file in this court notice of intention to petition the Supreme Court for writ of certiorari to review the decision of this court in this cause, the untimely notice of such intention is a nullity and an order will be entered striking it from the record. See Atkinson v. State, Fla.App., 109 So.2d 581.
STURGIS, C.J., and CARROLL, DONALD and WIGGINTON, JJ., concur.