265 So.2d 888

**Tommy William DAVIDSON**

v.

**STATE.**

**1 Div. 53.**

Court of Criminal Appeals of Alabama.

Aug. 17, 1971.

Rehearing Denied Feb. 8, 1972.

MacDonald Gallion, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

C. Wayne Loudermilch and Robert M. Harper, Mobile, for appellant.

## PER CURIAM.

The defendant was indicted for the offense of murder in the first degree and convicted of the offense of murder in the second degree. Judgment was duly entered and the defendant was sentenced to thirty years in the penitentiary.

The body of Charles Vander Wielen, the person alleged in the indictment to have been killed, was found in the front seat of his automobile just off Highway I-10 in Baldwin County about fifteen miles East of the unincorporated community of Loxley. The automobile had proceeded off said highway, down a fill, and through the fence which borders the highway and on several feet further. The body and the automobile were found about 7:30 A. M. on the morning of May 20, 1968. In addition to the body of the deceased, the officers found a baseball bat, a ball peen hammer, and a screwdriver in the automobile. There were some clothes hanging on the driver's side of the automobile, a Luger pistol was recovered from "one pocket and a clip out of the other pocket."

State Toxicologist Nelson E. Grubbs examined the body of the deceased and performed an autopsy thereon. After testifying to the injuries he found, he stated that in his opinion death was due to violent force to the back of the head with a blunt instrument. He said that he found four wounds in the head which had been made with a sharp instrument. He fitted the screw driver found in the car into those wounds and it fit them perfectly. He further testified that he found glass particles, some paint particles, grease, and pinestraw between the undershirt and trousers of the deceased.

Dr. Grubbs also said that in the basement of the Mobile County Jail he later examined a Pontiac automobile which was identified by other witnesses as being the property of defendant's mother. Dr. Grubbs stated that he found human blood stains, particles of glass, and pinestraw in this car.

The witness stated that he examined a house which was identified by other witnesses as being the home of the defendant's mother and her husband, the deceased, prior to his death. Defendant's mother was not living in the house at the time it was examined by the witness. No one was living in it at that time. The defendant's mother had moved to Pensacola, Florida, after the death of the deceased. The defendant did not live in that house and had never lived in it. It had been leased to his mother and the deceased. Dr. Grubbs found human blood stains in that house and particles of glass.

The articles found in the car of the deceased, those found in the automobile belonging to defendant's mother, and those found in the house where his mother was living at the time of the death of the deceased were admitted into evidence. The defendant objected to the admission of those articles taken from his mother's car and from the above mentioned house as well as all evidence concerning them on the ground of an unlawful search and seizure.

About 11:00 A.M. on May 28, 1968, the Mobile County Officers stopped the defendant and his wife and mother in the car of the mother on Interstate 65 and told the defendant that the sheriff wanted to talk with them. Those three went with said officers to the sheriff's offices at the courthouse and jail in Mobile. One car of officers rode in front of the defendant and his mother and another car of officers behind them on the way to the basement of the courthouse, where the cars were parked. They then proceeded through three locked doors on the way from the basement to the sheriff's offices where the three were seated in a hall. They remained in and about the offices until about 3:00 P.M. when the

Sheriff of Baldwin County arrived. They were not told that they were under arrest although it is evident that they could not have left without the permission of the officers.

Taylor Wilkins, Sheriff of Baldwin County, testified that they secured a search warrant and searched the automobile belonging to the defendant's mother before he (the sheriff) talked to the defendant; that during the course of the afternoon he talked to the defendant about twice and later a third time with Mr. Driggers, a Mobile County Officer. According to the State's evidence, Sheriff Wilkins was the first officer to interrogate the defendant. During the testimony of Sheriff Wilkins regarding this interrogation, the following occurred:

"Q. What did you tell him?

"A. I asked him what his name was and he told me and then I knew he was the one I wanted to talk to.

"Q. What else did you say to him?

"A. I asked one or two or three things like where was he living and then I told him I wanted to talk to him and I advised him of his rights regarding the statement and I talked to him about the death of his stepfather.

"Q. What did you tell him with regard to this, with regard to his rights?

"A. I told him that he had a right to remain silent if he wanted to. He didn't have to talk if he didn't want to. If he made any statements it could and would be used in a Court of law against him. I told him that he had a right to an attorney before he talked and if he couldn't afford one or didn't have one the Court would appoint him one and that he had a right to stop at any time during the interrogation if he wanted to and not make any further statements and not make any until he conferred with an attorney."

Sheriff Wilkins did not obtain a confession from the defendant. The defendant denied any knowledge of the disappearance of the deceased in answer to Wilkins' questions. Wilkins questioned him later in the day and again did not secure a confession.

Officer Driggers testified that he heard Sheriff Wilkins inform the defendant of his rights.

About 10:00 P.M. that night the defendant's wife, Laura Davidson, told Sheriff Wilkins and Officer Driggers that she was going to tell the truth. She then told the officers that her husband left home that night before the deceased was found dead the following morning, and came back about 6:00 A.M. the next morning and had his mother with him. She said she would try to get the defendant to tell the truth. The officers carried her to the room where the defendant was in the sheriff's offices. In the presence of those two officers and perhaps others, she talked with the defendant, her husband. It was an emotional scene. She cried and the defendant cried. She pled with him to tell them what he knew and he said he would. At that point Officer Driggers testified as follows:

"Q. Did you take a statement from him?

"A. I did.

"Q. What did you tell him prior to taking his statement?

"A. I explained Tommy's rights to him and gave him a form that we use explaining the rights of an individual prior to taking a statement. I told him that he must read and he must understand those rights before I could take a statement from him.

"Q. What are some of the things that you told him?

"A. By memory?

"Q. Yes.

"A. I told Tommy that he must understand his rights. That if he made a statement that said statement could and would be used in a court of law. I told him that he had a right to talk to a law-

yer for advice before making any statement and have a lawyer with him during the questioning. I further told Tommy that if he could not afford a lawyer one would be appointed for him by the Court. I further told Tommy that if he wished to make a statement out of the presence of his attorney or a lawyer that he would have the right to stop answering at any time he so desired.

"Q. Did he appear to understand what you were saying?

"A. Yes sir he did.

"Q. Was it read to him?

"A. Yes sir. He read it and I read it.

"Q. Do you have the form that you read to him?

"A. Yes sir."

Officer Driggers further testified that the defendant signed the above mentioned form and it was introduced in evidence. It is as follows:

"STATE'S EXHIBIT 34

"YOUR RIGHTS

"Place    Sheriff Dept.
Date    May 28, 1968
Time    10:55 P.M.

"Before we ask you any questions, you must understand your rights.

"You have the right to remain silent.

"Anything you say can and will be used against you in Court.

"You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

"If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

"If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

"WAIVER OF RIGHTS

"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises threats, or inducements have been made to me and no pressure or coercion of any kind has been used against me.

"SIGNED  /s/ Tommy Davidson

"WITNESS  /s/ L. P. Driggers

"WITNESS  /s/ Taylor Wilkins

"TIME    11:05 P.M."

A stenographer was brought in and took in shorthand the defendant's confession in which he admitted killing the deceased with a baseball bat at his mother's home in Mobile, helping his mother carry him out on Highway I–10, running the car with him in it off the fill and through the fence, leaving him and the car where they were found, and other details of the murder. The statement was typed and the defendant signed it after reading it. His confession thus written and signed was introduced into evidence.

The defendant and his wife deny in their testimony much of the testimony of Officers Driggers and Sheriff Wilkins. She testified that those officers told her if the defendant would talk he would probably only be convicted of manslaughter and that it would most likely be a case of self-defense. They both testified that he was not warned of his rights until just before the stenographer took down his statement; that they questioned him several times prior to his final confession without any warning of his rights; that they were questioned separately in very small rooms and at no time did they have a chance to confer alone

before the statement was made; but the defendant did not claim he asked to talk with his wife or mother alone.

The defendant made a motion for the State to produce for the defendant's use certain things, papers, etc. The motion was granted in part and denied in part by the court.

The defendant requested a number of written charges, some of which were given and others refused by the court.

Thus, there are a number of questions which call for an answer by this court. We turn our attention first to the defendant's confession and its admissibility.

■ In the case of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court of the United States made the following statements of the law:

"* * * By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * *"

When that is the case, the Court said:

"Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. * * * If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."

The Court, after discussing various cases, made this statement with reference to the time when a suspect must be warned of his rights:

"In none of these cases was the defendant given a full and effective warning of his rights at the outset of the interrogation process."

Another very relevant statement in the *Miranda* opinion is as follows:

"* * * As we have stated before, 'Since Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.' Blackburn v. State of Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). * * *"

Further on in that same opinion we find the following:

"This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we reassert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. * * *"

"* * * The record must show, or there must be an allegation and evidence which show, that an accused was offered

counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver * * *

"* * * Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."

With further reference to the time when the warnings of a defendant's rights must be given, we quote from the case of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, wherein it is said:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, * * * and the police have not effectively warned him of his absolute constitutional rights to remain silent, the accused has been denied * * *"

The provisions of the Fifth Amendment to the Constitution of the United States against self-incrimination were at one time applied as a restraint on the Federal Government only. But it has been held that the Fourteenth Amendment makes that and other rights and restraints in the Bill of Rights applicable to the States. Among the cases so holding is Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, wherein it is stated:

"The Fourteenth Amendment secures against State invasion the same privileges that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in unfettered exercise of his own will, and to suffer no penalty, as held in Twining [v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97], for such silence."

Applying the law as thus proclaimed by the Supreme Court of the United States to the case before us, we hold that the interrogation of the defendant was in custody or custodial interrogation for it is clear from the evidence that while he had not been told he was under arrest, yet he was "otherwise deprived of his freedom of action in a significant way." He was behind locked doors, surrounded by officers of the law, placed in a room alone, and was never told he could leave. He had been brought to the sheriff's office with one car of officers in front and one car of officers behind the car in which he was riding. One of the officers testified that had he tried to escape on the way to the sheriff's office, he would have stopped him.

As to the time when the warning of his rights must be given to him, the Supreme Court of the United States in the cases quoted above used such expressions as "prior to questioning," "at the outset," and "that where the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect."

There is sufficient evidence in this case to support the trial judge's conclusion that the warnings of the defendant's right were given by the officers at the proper time. That is to say that such warning was done prior to any questioning, at the outset, and when the investigation began to focus on him as a suspect. Officer Driggers, who secured his confession, had said he heard the warning given by Sheriff Wilkins; that he did not question him until he said he wanted to make a statement; that he warned him before questioning him; and that he took the statement immediately thereafter. While this is controverted by the defendant and his wife there must be, if laws are to be enforced, some tribunal vested with the right to judge where the truth is found. The trial judge did that and is supported by ample evidence. We hold that the State carried the burden of proof placed upon it.

It is also the decision of this court that the warning given by Sheriff Wilkins

met the *Miranda* requirements. We further hold that the warning given the defendant by Officer Driggers met those requirements and that the defendant understandingly and intelligently waived his right to an attorney and made a voluntary confession. We find ample evidence to support the holding of the trial court that defendant's confession was not the result of coercion, mental or physical, but the result of his free choice. We will not disturb the decision of the trial court in that respect.

We now come to a consideration of the admissibility of the evidence obtained in the search of the automobile belonging to the mother of the defendant and the house in which she and the deceased resided at the time of his death, but in which she did not reside at the time of the search.

In the case of Aldridge v. State, 278 Ala. 470, 179 So.2d 51, the court said:

"The right to protection against an unlawful search is personal, and a defendant in a criminal case who denies any proprietary or possessory interest in seized property has no standing to object to the method of seizure. Shurman v. United States (5th Cir.), 219 F.2d 282; United States v. Serrano (2nd Cir.), 317 F.2d 356; Williams v. United States (10th Cir.), 323 F.2d 90; United States ex rel. Smith v. Reincke, D.C., 239 F.Supp. 887."

See Guenther v. State, 282 Ala. 620, 213 So.2d 679, and Baldwin v. State, 282 Ala. 653, 213 So.2d 819.

In the case of Cameron v. State, Fla. App., 112 So.2d 864, an automobile driven by Cameron, and in which Wesley Pless was a passenger, was stopped by officers. The two men were arrested on suspicion, the automobile was searched and articles taken therefrom. The officers later learned that the articles taken from the car in the search were the products of a robbery. Cameron and Pless were indicted and tried for the robbery and the articles taken from the car were admitted in evidence over their objection. The court held:

"While the exact question does not appear to have been heretofore considered or passed upon by our Supreme Court, it is clear from a review of other authorities that the constitutional guarantee to be secure against unreasonable searches and seizures accrues only to the persons in whom is vested the lawful right of possession of the premises searched, and does not extend to others who might incidentally be on the premises at the time the search is made. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409; United States v. Pepe, 2 Cir., 247 F.2d 838; Lovette v. United States, 5 Cir., 230 F.2d 263; Connolly v. Medalie, 2 Cir., 58 F.2d 629; United States v. Messina, 2 Cir., 36 F.2d 699.

"Since defendant Pless was neither the owner nor had the lawful right to possession of the automobile which was the subject of the search resulting in seizure of the stolen property, he was not in position to object to the search and seizure. This would be the case even if the search and seizure had been unlawful as to Cameron. The evidence seized was therefore admissible in the trial of the charges against him."

A leading case on "standing to object to the admission of evidence the product of unreasonable search and seizure" is Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, in which the court said:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. * * * The restrictions upon searches and seizures

were obviously designed for protection against official invasion of privacy and the security of property. They are not exclusionary provisions against the admission of kinds of evidence deemed inherently unreliable or prejudicial. The exclusion in federal trials of evidence otherwise competent but gathered by federal officials in violation of the Fourth Amendment is a means for making effective the protection of privacy."

In that case the court further stated:

" * * * We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. * * * Distinctions such as those between 'lessee,' 'licensee,' 'invitee' and 'guest,' often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards."

So, the fact alone that the defendant had no property right in the property searched will not bar his standing. However, in this case the house which was searched was vacant; the defendant did not live there; his mother did not live there; and neither of them were present on the premises. He did not have the right of possession. The automobile which was searched was the property of his mother. It is true that the defendant had been in the car on the day it was searched, but that was several hours before the search. The search was directed against his mother, the search warrant was served on her, and the automobile was searched in her presence. The defendant at the time of the search was not in the automobile or even near it. His right of privacy was not violated, nor were any of his property rights invaded.

We, therefore, hold that appellant was without standing to object to the search or the admission of articles or evidence seized in the searches of the house and the car.

■ The defendant claims error on the part of the trial court in denying that part of his motion to produce (1) written statements of all witnesses taken during the investigation of this case, (2) written statements of investigating officers taken in this case, and (3) reports of police and/or investigation officers.

No cases in point have been cited in briefs filed. 21 Am.Jr.2d 262, under the heading of Criminal Law, § 223, states:

"Due process does not require any particular form or mode of procedure, so long as fundamental rights are not denied. Accordingly a State is free, despite the Fourteenth Amendment, to regulate its procedure of its criminal courts in accordance with its own conception of policy, *unless in so doing it offends some principle of justice so rooted in the traditions and conscience of the people as to be ranked as fundamental.*" (Emphasis added.)

See Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 and Carter v. Illinois, 329 U.S. 173, 67 S.Ct. 216, 91 L. Ed. 172.

In the case of United States v. Krulewitch, 2 Cir., 145 F.2d 76, 156 A.L.R. 337, the court said:

"It is one thing to say that an accused shall *in advance of trial* have inspection of statements of witnesses taken by the prosecution in preparation of its case; it is another to deny him the benefit of so much of such statements as is shown to be inconsistent with the witnesses' testimony on the stand, and would impeach them." (Emphasis added.)

Such statement may become material after a witness has taken the stand. It is not material or competent evidence before.

In the case before us the instruments and statements which the defendant seeks to have exhibited to him are not evidence on any conceivable issue to be tried. They are not evidence for or against the defendant. It must be remembered that they were sought in advance of the trial and we must answer the question posed as of that time.

In this State a defendant has compulsory process for the attendance of witnesses. To deny him such process would in our opinion not only deny him a statutory right but also the constitutional right of due process. To deny him access to other evidence, under the supervision of the trial court, regardless of whose possession it is in would be equally as damaging to him as the denial of compulsory process for the attendance of witnesses. Evidence is evidence whether it be from a witness, a picture, an object or an instrument. If it exists it should be made available unless from some specific cause it is inadmissible. It should not be given a sanctuary from its production merely because it is in the hands of a district attorney or other officer of the State. To do so may violate the due process clause of the Fourteenth Amendment to the Constitution of the United States. However, the instrument and statement sought in the case before us is not, in advance of trial, evidence on any reasonably conceivable issue to be tried. There was no error in the ruling of the trial court in this respect. The defendant had no statutory or constitutional rights to have them exhibited to him and in their denial we see no principle of a fair trial violated. This motion to produce is very similar to those in Smith v. State, 282 Ala. 268, 210 So.2d 826, and Mabry v. State, 40 Ala.App. 129, 110 So.2d 250, cert. dismissed 268 Ala. 660, 110 So.2d 260.

The defendant requested several written charges which were refused by the trial court. We have carefully considered those refused charges. Many of them were covered by the court's oral charge or by charges which were given by the court at the request of the defendant. All of the others were incorrect statements of the law. There was no error in their refusal. To write further thereon would only prolong this opinion beyond that which is reasonable or necessary.

In accordance with Tit. 15, § 389, Code of Alabama, 1940, we have carefully reviewed the record on this appeal and find no error contained therein.

The judgment appealed from is therefore due to be and the same is hereby affirmed.

The foregoing opinion was prepared by L. S. Moore, Supernumerary Circuit Judge, and adopted by this Court as its opinion.

Affirmed.

## ON REHEARING

PER CURIAM.

On rehearing appellant insists the Court failed to address itself to the refusal of the Trial Court to compel production of prior written statements of several State's witnesses for cross-examination purposes. These are the same statements that appellant sought production of in his pretrial motion. So far as we can ascertain from the record, these statements were not used by the prosecution during trial. They were not exhibited to the jury or used by the witnesses to refresh their recollection, and no predicate was laid by the defense to show that these statements were in any way contradictory of the witnesses' testimony at trial.

Opinion extended, application overruled.

CATES, J., not sitting.