STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RALPH A. GERVASIO, JR. AND DANA ANN MICHIE, DEFENDANTS-APPELLANTS.

Argued January 25, 1983—Decided July 19, 1983.

*Steven K. Kudatzky* argued the cause for appellants (*Tomar, Parks, Seliger, Simonoff & Adourian,* attorneys; *Steven K. Kudatzky* and *Arthur F. Hermann,* on the briefs).

*Carol M. Henderson,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.

On September 25, 1978 the State Police conducted a routine stop of defendants' car to check for compliance with driver's license and vehicle registration laws and discovered that defendants were transporting 167 pounds of marijuana. Six months later, on March 27, 1979, the Supreme Court in *Delaware v. Prouse,* 440 *U.S.* 648, 99 *S.Ct.* 1391, 59 *L.Ed.*2d 660, declared that such random stops of vehicles on the public roads violated the Fourth Amendment of the United States Constitution. At issue in this case is whether the *Prouse* decision should be applied retroactively to suppress the evidence of marijuana that was uncovered in the events following the stop of defendants' car.

This Court previously addressed this issue in *State v. Carpentieri,* 82 *N.J.* 546 (1980), where we determined that the *Prouse* decision should apply only to those random traffic stops occurring after the *Prouse* decision. We concluded that "the principles of deterrence underlying *Prouse* would hardly be fostered by retroactive application to law enforcement actions undertaken in good-faith reliance upon then long-standing legal authority." *Id.* at 549. We also noted that if *Prouse* were to apply retroactively, "[t]he consequent encumbering of an already overburdened judiciary would operate only to the detriment of the administration of justice." *Id.* at 549–50.

The central question presented in this appeal is whether the *Carpentieri* decision remains vital in light of the Supreme Court's recent discussion of the law of retroactivity in *United*

*States v. Johnson,* 457 *U.S.* 537, 102 *S.Ct.* 2579, 73 *L.Ed.*2d 202 (1982). We now hold that because the *Prouse* decision represented a clear break with the preexisting state of constitutional adjudication, it need not be given retroactive effect under the terms of the *Johnson* decision. We therefore affirm the determination in *Carpentieri* that evidence obtained in random stops occurring prior to March 27, 1979 may be admissible.

## I

Early in the morning of September 25, 1978, two State troopers stopped defendants' automobile on the New Jersey Turnpike. The officers testified that they made only "a routine stop" of the defendants' car and that prior to the stop they had not observed any traffic or equipment violations or any suspicious activity. After asking for the driver's license and the automobile's registration papers, one of the troopers smelled marijuana. Defendant Gervasio, the driver, permitted the officer to look in the trunk of the car[1] where the officer found five bales of marijuana weighing a total of 167 pounds. Both defendants were indicted for possession of a controlled dangerous substance and possession of a controlled dangerous substance with intent to distribute. *N.J.S.A.* 24:21–20(a)(4), –19(a)(1).

On June 15, 1979 the trial court heard a motion to suppress the evidence seized as a result of the stop, but reserved judgment pending our decision in *Carpentieri.* Following our determination in *Carpentieri* that *Prouse* should apply only prospectively, the trial court upheld the legality of the license and registration check under the prior law. The court held that the stop was lawful, that the officers thereafter had reasonable

---

[1] The State trooper testified that he told the defendant Gervasio that because of the suspected contraband he would have to take the car in and obtain a search warrant, unless the defendant would consent to a search of the trunk. Gervasio testified that the trooper told him that New Jersey law required that he submit to the search. The trial court believed the testimony of the State trooper and concluded that consent was voluntarily granted. We find no reason to upset this factual determination.

cause to believe the automobile contained marijuana and to seek a warrant, and that defendant's consent to search was therefore valid. The defendants then pleaded guilty to possession of a controlled dangerous substance but appealed the suppression order under *R.* 3:5–7(d). The Appellate Division affirmed in an unreported opinion. We granted certification. 91 *N.J.* 266 (1982).

## II

*United States v. Johnson* is the latest in a series of Supreme Court decisions that seek to define when new constitutional rules of criminal procedure should be applied retroactively. The *Johnson* case posed the question of whether the Supreme Court's decision in *Payton v. New York,* 445 *U.S.* 573, 100 *S.Ct.* 1371, 63 *L.Ed.2d* 639 (1980) (warrantless, nonconsensual entry into a suspect's home to make a routine felony arrest is impermissible under the Fourth Amendment) should be applied in all cases on direct appeal. In essence, the Court's analysis in *Johnson* mandated that Court decisions interpreting the Fourth Amendment be applied retroactively unless the decision represents "a clear break with the past." *United States v. Johnson, supra,* 457 *U.S.* at 549, 102 *S.Ct.* at 2587, 73 *L.Ed.2d* at 213 (quoting *Desist v. United States,* 394 *U.S.* 244, 248, 89 *S.Ct.* 1030, 1033, 22 *L.Ed.2d* 248, 254 (1969)). When a decision constitutes a sharp break with prior caselaw, prospective application of the new rule is required because of the "reliance by law enforcement authorities on the old standards and [the] effect on the administration of justice of a retroactive application of the new rule." *Id.* 457 *U.S.* at 549, 102 *S.Ct.* at 2587, 73 *L.Ed.2d* at 214.

The *Johnson* decision identified three circumstances in which a ruling represents a clear break with the past:

[s]uch a break has been recognized only when a decision [1] explicitly overrules a past precedent of this Court, or [2] disapproves a practice this Court arguably has sanctioned in prior cases, or [3] overturns a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved. [*Id.* at 551, 102 *S.Ct.* at 2588, 73 *L.Ed.2d* at 215 (citations omitted) ]

The Supreme Court in *Johnson* concluded that because "Payton did none of these," *ibid.,* it did not present a clear break. As explained by the Court,

Payton expressly overruled no clear past precedent of this Court on which litigants may have relied. Nor did Payton disapprove an established practice that the Court had previously sanctioned. To the extent that the Court earlier had spoken to the conduct engaged in by the police officers in Payton, it had deemed it of doubtful constitutionality. The Court's own analysis in Payton makes it clear that its ruling rested on both long-recognized principles of Fourth Amendment law and the weight of historical authority as it had appeared to the Framers of the Fourth Amendment. Finally, Payton overturned no longstanding practice approved by a near-unanimous body of lower court authority. [*Id.* at 552–53, 102 *S.Ct.* at 2588–89, 73 *L.Ed.*2d at 215–16 (footnotes omitted)]

The Court noted that for nearly a century the Fourth Amendment had been interpreted to "accord[ ] special protection to the home." *Id.* at 552 n. 13, 102 *S.Ct.* at 2589 n. 13, 73 *L.Ed.*2d at 215 n. 13. It also recognized that prior to the *Payton* decision warrantless house entries to make an arrest were sanctioned only in 24 of the 50 states and in 2 of the 7 federal circuits that had considered the question. *Id.* at 553 n. 15, 102 *S.Ct.* at 2589 n. 15, 73 *L.Ed.*2d at 216 n. 15. Consequently, because *Payton* was not a "clear break" case, it was to apply retroactively to all cases on direct review under the law of Fourth Amendment retroactivity articulated in *Johnson.*

The decisive question in the current appeal is whether the *Prouse* decision constituted a clear break in the law under the three-pronged definition of "clear break" articulated in *Johnson.* Because the practice of conducting random stops of automobiles to verify compliance with driver's license and automobile registration laws was "arguably sanctioned" by the Supreme Court prior to the *Prouse* decision and, also, was expressly approved by a wide majority of lower courts, we hold that the *Prouse* decision represented a clear break with the preexisting state of constitutional adjudication under two of the *Johnson* prongs and should be applied only prospectively.

Prior to the *Prouse* decision, the Supreme Court had never expressly approved or disapproved random stops of automobiles by state and local authorities for the purpose of ensuring

compliance with driver's license and automobile registration requirements. However, the Court had previously determined the permissibility of random stops of automobiles by immigration authorities seeking to identify and apprehend illegal aliens. *United States v. Brignoni-Ponce*, 422 *U.S.* 873, 95 *S.Ct.* 2574, 45 *L.Ed.2d* 607 (1975); *see United States v. Martinez-Fuerte*, 428 *U.S.* 543, 96 *S.Ct.* 3074, 49 *L.Ed.2d* 1116 (1976) (investigatory stop of automobile at border patrol checkpoint). In *Brignoni-Ponce* the Court held that under the Fourth Amendment roving border police may not stop a vehicle and question its occupants about their citizenship and immigration status unless the officers possess a reasonable suspicion that the vehicle contains. illegal aliens. The Court, however, distinguished between random stops by border patrols to detect illegal aliens and random stops by state and local police to enforce motor vehicle laws. The Court "arguably sanctioned" the latter, writing

> [o]ur decision in this case takes into account the special function of the Border Patrol, the importance of the governmental interests in policing the border area, the character of roving-patrol stops, and the availability of alternatives to random stops unsupported by reasonable suspicion. Border Patrol agents have no part in enforcing laws that regulate highway use, and their activities have nothing to do with an inquiry whether motorists and their vehicles are entitled, by virtue of compliance with laws governing highway usage, to be upon the public highways. *Our decision thus does not imply that state and local enforcement agencies are without power to conduct such limited stops as are necessary to enforce laws regarding drivers' licenses, vehicle registration, truck weights, and similar matters.* [422 *U.S.* at 883 n. 8, 95 *S.Ct.* at 2581 n. 8, 45 *L.Ed.2d* at 618 n. 8 (emphasis added)]

The signals emanating from the Court seemed clear: investigatory stops of automobiles for the purpose of determining whether the car and driver were entitled to be on the road remained within the arsenal of permissible police practices to ensure highway safety. In fact, prior to the *Prouse* decision, this language from *Brignoni-Ponce* was relied upon by several lower courts as evidence that the Supreme Court approved such random investigatory stops. *United States v. Jenkins,* 528 *F.2d* 713, 715 (10 Cir.1975); *State v. Holmberg,* 194 *Neb.* 337, 231 *N.W.2d* 672, 678 (1975); *State v. Bloom,* 90 *N.M.* 226, 561 *P.2d* 925, 932 (1976) rev'd on other grounds 90 *N.M.* 192, 561 *P.2d* 465 (1977).

Police texts on constitutional law also relied on this understanding of the authority of law enforcement officers. *See, e.g.,* J. Klotter, J. Kanovitz, *Constitutional Law for Police* § 3.14(b) (3 ed. 1977). This interpretation of the law was further supported by the Court's emphasis in *United States v. Martinez-Fuerte, supra,* upon the reduced expectations of privacy of an occupant of an automobile, *id.,* 428 U.S. at 561, 96 *S.Ct.* at 3084–85, 49 *L.Ed.2d* at 1130, "the long history evidencing [the] utility" of brief stops for questioning, *id.* at 560 n. 14, 96 *S.Ct.* at 3084 n. 14, 49 *L.Ed.2d* at 1130 n. 14, and the acceptance by the public of such stops "as incident to highway use." *Ibid. See also Brinegar v. United States,* 338 U.S. 160, 188, 69 *S.Ct.* 1302, 1317, 93 *L.Ed.* 1879, 1897 (Jackson, J., dissenting) reh. den. 338 U.S. 839, 70 *S.Ct.* 31, 94 *L.Ed.* 513 (1949) (officials may stop car without probable cause for regulation of traffic, identification where proper and in many other circumstances that do not imply an arrest or charge of crime). This notion of a reduced expectation of privacy in the use of an automobile may be instructively contrasted with the "special protection [accorded] to the home" that was emphasized by the Supreme Court in *Johnson* in reaching its conclusion that the *Payton* decision be given retroactive effect. 457 U.S. at 552 n. 13, 102 *S.Ct.* at 2589 n. 13, 73 *L.Ed.2d* at 215 n. 13. Thus, because the police practice invalidated by *Prouse* was arguably approved by previous decisions of the Court, the *Prouse* decision should be considered a clear break case under the rules of retroactivity announced in *Johnson.*[2]

---

[2]The case of *Adams v. Illinois,* 405 U.S. 278, 92 *S.Ct.* 916, 31 *L.Ed.2d* 202 (1972) (plurality opinion) was cited in *Johnson* as exemplifying those cases in which the Supreme Court had arguably sanctioned practices that were disapproved by subsequent decisions. *Adams* considered whether *Coleman v. Alabama,* 399 U.S. 1, 90 *S.Ct.* 1999, 26 *L.Ed.2d* 387 (1970) (accused entitled to counsel at preliminary hearing) should apply retroactively. The Court in *Adams* noted that prior to *Coleman* lower courts had "not unreasonably regarded [the existing Supreme Court precedents] as fashioning limited constitutional rules governing preliminary hearings." *Adams, supra,* 405 U.S. at 283, 92 *S.Ct.* at 920, 31 *L.Ed.2d* at 208. The limited pre-*Coleman* rules for conducting preliminary hearings did not expressly contradict the *Coleman*

The *Prouse* decision can also be viewed as a clear break from the prior caselaw because it "overturn[ed] a longstanding and widespread practice ... which a near-unanimous body of lower court authority has expressly approved." *Johnson, supra,* 457 *U.S.* at 551, 102 *S.Ct.* at 2588, 73 *L.Ed.2d* at 215. We have carefully examined the caselaw in order to determine the degree to which random stops were sanctioned at the time of the *Prouse* decision. Our survey indicates that a large majority of jurisdictions approved of such random stops prior to the Supreme Court's decision in *Prouse*.[3] Our own caselaw in New

---

ruling; they simply did not "clear[ly] foreshadow[ ]" *Coleman* and a "contrary inference was not unreasonable[.]" *Ibid.* Nevertheless, *Johnson* regarded *Coleman* as a clear break case in which the Court had "disapprove[d] a practice this Court arguably ha[d] sanctioned in prior cases." *Johnson, supra,* 457 *U.S.* at 551, 102 *S.Ct.* at 2588, 73 *L.Ed.2d* at 215. Similarly, *Prouse* must be regarded as a clear break case. Lower courts that read footnote 8 in *Brignoni-Ponce* certainly were not unreasonable in their belief that the Court had sanctioned random stops to check driver's license and vehicle registration documents. This arguable sanctioning of the practice that was ultimately disapproved by *Prouse* requires that *Prouse,* like *Coleman,* be applied only prospectively as a clear break case.

[3]Prior to the *Prouse* decision, six of the seven federal circuit courts that had ruled on the issue upheld the practice of randomly stopping automobiles for compliance with driver's license and vehicle registration laws. *United States v. Berry,* 369 *F.2d* 386 (3 Cir.1966); *United States v. Kelley,* 462 *F.2d* 372 (4 Cir.1972); *Myricks v. United States,* 370 *F.2d* 901 (5 Cir.1967), *cert.* dism'd, 386 *U.S.* 1015, 87 *S.Ct.* 1366, 18 *L.Ed.2d* 474 (1967); *United States v. Turner,* 442 *F.2d* 1146 (8 Cir.1971); *Lipton v. United States,* 348 *F.2d* 591 (9 Cir.1965); *United States v. Carrizoza-Gaxiola,* 523 *F.2d* 239 (9 Cir.1975); *United States v. Lepinski,* 460 *F.2d* 234 (10 Cir.1972); *United States v. Jenkins,* 528 *F.2d* 713 (10 Cir.1975). Only the D.C. Circuit reached a contrary result. *United States v. Montgomery,* 561 *F.2d* 875 (D.C.Cir.1977). Two other circuits had expressly reserved the question. *United States v. DeMarco,* 488 *F.2d* 828, 831 n. 6 (2 Cir.1973); *United States v. Cupps,* 503 *F.2d* 277, 282 (6 Cir.1974).

Similarly, almost two-thirds of those state courts that had ruled on the question determined that such random stops were permissible. Decisional law in 16 states approved of random stops. *Kinard v. State,* 335 *So.2d* 916 (Ala.Cr.App.1975) rev'd on other grounds, 335 *So.2d* 924 (Ala.1976); *People v. Washburn,* 265 *Cal.App.2d* 665, 71 *Cal.Rptr.* 577 (Cal.Ct.App.1968); *People v. Nunn,* 264 *Cal.App.2d* 919, 70 *Cal.Rptr.* 869 (Cal.Ct.App.1968); *Palmore v. United States,* 290 *A.2d* 573 (D.C.1972), aff'd on jurisdictional

Jersey, for example, expressly authorized police to make such random stops of automobiles. *State v. Gray*, 59 *N.J.* 563, 567 (1971); *State v. Kabayama*, 98 *N.J.Super.* 85, 87–88 (App.Div.

grounds only, 411 *U.S.* 389, 93 *S.Ct.* 1670, 36 *L.Ed.2d* 342 (1973); *Smith v. State*, 155 *So.2d* 826 (Fla.App.1963) *cert.* dism., 157 *So.2d* 815 (Fla.1963) (without opinion), *cert.* dism. 167 *So.2d* 225 (Fla.1964) (with opinions); *Cameron v. State*, 112 *So.2d* 864 (Fla.App.1959); *Byrd v. State*, 80 *So.2d* 694 (Fla.1955); *Brisbane v. State*, 233 *Ga.* 339, 211 *S.E.2d* 294 (1974); *People v. James*, 44 *Ill.App.3d* 300, 3 *Ill.Dec.* 88, 358 *N.E.2d* 88 (1976); *People v. Francis*, 4 *Ill.App.3d* 65, 280 *N.E.2d* 49 (1972); *People v. Harr*, 93 *Ill.App.2d* 146, 235 *N.E.2d* 1 (1968); *City of Overland Park v. Sandy*, 225 *Kan.* 102, 587 *P.2d* 883 (1978); *Coston v. State*, 252 *Miss.* 257, 172 *So.2d* 764 (1965); *Morgan v. Town of Heidelberg*, 246 *Miss.* 481, 150 *So.2d* 512 (1963); *State v. Rankin*, 477 *S.W.2d* 72 (Mo.1972); *Kansas City v. Fulton*, 533 *S.W.2d* 677 (Mo.App.1976); *State v. Kretchmar*, 201 *Neb.* 308, 267 *N.W.2d* 740 (1978); *State v. Holmberg*, 194 *Neb.* 337, 231 *N.W.2d* 672 (1975); *State v. Gray*, 59 *N.J.* 563 (1971); *State v. Allen*, 282 *N.C.* 503, 194 *S.E.2d* 9 (1973); *State v. Maloney*, 109 *R.I.* 166, 283 *A.2d* 34 (1971); *State v. Williams*, 237 *S.C.* 252, 116 *S.E.2d* 858 (1960); *Murphy v. State*, 194 *Tenn.* 698, 254 *S.W.2d* 979 (1953); *Fatemi v. State*, 558 *S.W.2d* 463 (Tex.Cr.App. 1977); *Faulkner v. State*, 549 *S.W.2d* 1 (Tex.Cr.App.1976); *Leonard v. State*, 496 *S.W.2d* 576 (Tex.Cr.App.1973). *See United States v. Vanguilder*, 297 *F.Supp.* 71 (D.Md.1969) (applying Maryland law); *United States v. Thomas*, 289 *F.Supp.* 364 (S.D.N.Y.1968) (applying New York law). Courts in ten states reached contrary determinations. *State v. Ochoa*, 112 *Ariz.* 582, 544 *P.2d* 1097 (1976); *State v. Prouse*, 382 *A.2d* 1359 (Del.1978); *State v. Bonds*, 59 *Hawaii* 130, 577 *P.2d* 781 (1978); *Goode v. State*, 41 *Md.App.* 623, 398 *A.2d* 801 (1979); *State v. McKinley*, 305 *Minn.* 297, 232 *N.W.2d* 906 (1975); *State v. Ruud*, 90 *N.M.* 647, 567 *P.2d* 496 (1977); *People v. Ingle*, 36 *N.Y.2d* 413, 369 *N.Y.S.2d* 67, 330 *N.E.2d* 39 (1975); *State v. Albertsen*, 37 *Or.App.* 679, 590 *P.2d* 235 (1978); *Commonwealth v. Swanger*, 453 *Pa.* 107, 307 *A.2d* 875 (1973); *State v. Frisby*, 245 *S.E.2d* 622 (W.Va.1978) *cert.* den., 439 *U.S.* 1127, 99 *S.Ct.* 1043, 59 *L.Ed.2d* 87 (1979). *See United States v. Bell*, 383 *F.Supp.* 1298 (D.Neb.1974) (applying Neb. law).

A number of law review articles published before *Prouse* also noted the widespread acceptance of random automobile stops as within the authority of the police. Note, "Automobile License Checks and the Fourth Amendment," 60 *Va.L.Rev.* 666, 670 (1974); Note, "*Commonwealth v. Swanger*—Spot-Checks Eliminated," 47 *Temp.L.Q.* 640, 643–44 (1974); Note, "Automobile Spot Checks and the Fourth Amendment," 6 *Rut.–Cam.L.Rev.* 85 (1974); Note, "Nonarrest Automobile Stops: Unconstitutional Seizures of the Person," 25 *Stan.L.Rev.* 865 (1973).

1967), aff'd o.b., 52 *N.J.* 507 (1968); *State v. Astalos,* 160 *N.J.Super.* 407 (Law Div.1978). Given the widespread approval of the police practice that *Prouse* invalidated and the express approval of the practice in New Jersey law, the *Prouse* decision must be seen to represent a clear break in the law.[4]

As a clear break from the preexisting constitutional jurisprudence, the *Prouse* case should be applied only prospectively under the terms of *Johnson.* This conclusion is entirely consistent with the logic of the *Johnson* opinion and the continuing public policy objectives of the retroactivity doctrine, namely, a recognition of past good faith reliance by police officers upon an accepted state of the law, the avoidance of administrative upheaval in the adjudication of criminal cases, and the preservation of criminal convictions founded upon fair trials and truthful

---

The dissent scrutinizes the authorities cited above, seeking to find a basis for distinguishing each of the pre-*Prouse* cases that had approved of random stops. In conducting this overly exacting analysis, the dissent fails to appreciate the clear holding of many pre-*Prouse* decisions. See, for example, *post* at 46–48 where the dissent seeks to distinguish two federal circuit cases and eight state court decisions because the police "had articulable suspicion, *on the facts*" (emphasis supplied) although the court decisions approved the legality of random stops. We note that the dissent fails to scrutinize with similar precision those cases that had anticipated the *Prouse* decision. For example, the only United States Court of Appeals decision that had invalidated the practice of random automobile stops involved a situation in which police clearly had *not* randomly stopped the defendant but sought to justify an otherwise illegal stop under its authority to conduct random stops; the disapproval of random stops in this case was correctly treated by a dissenter as *dicta. United States v. Montgomery, supra,* 561 *F.*2d at 890 n. 11 (Wilkey, J., dissenting).

[4]We recognize that the survey of the caselaw contained in the *Prouse* opinion indicates that the 12 jurisdictions that had previously reviewed random investigatory stops of automobiles split evenly on the constitutionality of the practice. *Prouse, supra,* 440 *U.S.* at 651, 99 *S.Ct.* at 1394–95, 59 *L.Ed.*2d at 666. However, the Supreme Court in *Prouse* was more concerned with identifying respectable authority evaluating the legality of random automobile stops than with assembling the decisions of all jurisdiction that had passed on this legal issue. The exact balance of authority on this question has only become an issue in determining the retroactivity of *Prouse.*

determinations of guilt. *Johnson* emphasized that clear break cases were to be applied only prospectively because of "reliance by law enforcement authorities on the old standards and [the] effect on the administration of justice of a retroactive application of the new rule." *Johnson, supra,* 457 *U.S.* at 550, 102 *S.Ct.* at 2587, 73 *L.Ed.2d* at 214. Because law enforcement authorities had justifiably relied upon long-standing legal authority in conducting random vehicle stops prior to the *Prouse* decision, *see State v. Carpentieri, supra,* 82 *N.J.* at 549; J. Klotter, J. Kanovitz, *Constitutional Law for Police, supra,* and because retrospective application of *Prouse* would have a detrimental effect upon the administration of justice, *State v. Carpentieri, supra,* 82 *N.J.* at 549–50, the *Prouse* decision should be applied only prospectively to those random stops occurring after March 27, 1979.

### III

Accordingly, we decline to apply *Prouse* retroactively to overturn defendants' convictions. The remaining issues on appeal are essentially factual and raise no important questions of constitutional law requiring us to disturb the conclusions of the lower courts. We therefore affirm the judgment of the Appellate Division.

*For affirmance*—Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and GARIBALDI—5.

*For reversal*—Chief Justice WILENTZ and Justice O'HERN —2.

O'HERN, J., dissenting.

I admire the majority's tenacity but not its theory in clinging to its holding in *State v. Carpentieri,* 82 *N.J.* 546 (1980). Just three years ago this Court foreswore as necessary to its theory of retroactivity that *Delaware v. Prouse,* 440 *U.S.* 648, 99 *S.Ct.* 1391, 59 *L.Ed.2d* 660 (1979), represented a "sharp break" with the past. It wrote that "it is of no moment whether the *Prouse*

decision in fact represents a 'sharp break' with existing law or is nothing more than a logical development following almost inevitably from earlier exclusionary rule decisions." 82 *N.J.* at 551.

In its view, then, retroactivity turned on whether the new constitutional principle dealt with the "integrity of the factfinding process." 82 *N.J.* at 551 (quoting *United States v. Peltier,* 422 *U.S.* 531, 535, 95 *S.Ct.* 2313, 2316, 45 *L.Ed.2d* 374, 380 (1975)). That decision of our Court was correct at the time; the one rendered today is not. Some review of the past is necessary to place the issue in perspective.

I

Justice Harlan has cautioned that those who would follow the efforts of the Supreme Court to deal with the retroactivity of new constitutional rules of criminal procedure will find the course "almost as difficult to follow as the tracks made by a beast of prey in search of its intended victim." *Mackey v. United States,* 401 *U.S.* 667, 676, 91 *S.Ct.* 1160, 1172, 28 *L.Ed.2d* 404, 411 (1971) (Harlan, J., concurring in *Mackey* and dissenting in *Williams v. United States,* 401 *U.S.* 675, 91 *S.Ct.* 1171, 28 *L.Ed.2d* 388).

Prior to 1965, courts generally gave retroactive effect to overruling decisions. In *Linkletter v. Walker,* 381 *U.S.* 618, 85 *S.Ct.* 1731, 14 *L.Ed.2d* 601 (1965), the Supreme Court decided the retroactive application of the exclusionary rule on searches and seizures enunciated in *Mapp v. Ohio,* 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.2d* 1081 (1961). Holding that the United States Constitution does not require retroactivity, the Court ruled that judicial policy would determine when and how to apply a new rule retroactively. The courts must "weigh the merits and demerits in each case," by considering the purpose of the new rule, the reliance placed upon the old rule, and the effect on the administration of justice of a retroactive application. 381 *U.S.* at 629, 636, 85 *S.Ct.* at 1737, 1741, 14 *L.Ed.2d* at 608, 612. Applying this test to *Mapp,* the *Linkletter* court declined to impose the rule

retroactively. Retroactive application of a procedural rule that had no bearing on guilt would not advance the purpose of effectively enforcing the Fourth Amendment by deterring the lawless action of the police (which had already occurred), would burden the administration of justice, and would be inconsistent with the states' reliance on the rule of *Wolf v. Colorado,* 338 *U.S.* 25, 69 *S.Ct.* 1359, 93 *L.Ed.* 1782 (1949). Therefore, the Supreme Court held *Mapp* should not apply retroactively. *Linkletter,* a *habeas corpus* proceeding, dealt only with collateral attack on judgments already final.

The Supreme Court extended *Linkletter* to an issue related to the fact-finding of a court in *Johnson v. New Jersey,* 384 *U.S.* 719, 86 *S.Ct.* 1772, 16 *L.Ed.*2d 882 (1966) (hereinafter *Johnson I* ), also a *habeas corpus* proceeding. The Court did not apply the new *Escobedo* and *Miranda* rules on custodial interrogation retroactively. *Id.* at 732, 86 *S.Ct.* at 1780, 16 *L.Ed.*2d at 891. Rather, it held that "whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree." *Id.* at 728–29, 86 *S.Ct.* at 1778, 16 *L.Ed.*2d at 889. There, given other available safeguards, the probability of prejudice was not great enough to outweigh policy considerations such as the justified reliance upon the old standard and the serious disruptive effect retroactive application would have upon the administration of justice. *Id.* at 729–31, 86 *S.Ct.* at 1778–79, 16 *L.Ed.*2d at 890–91.[1] *Johnson I* held that the *Escobedo* and *Miranda* rules would apply to trials begun after the dates of those decisions. *Id.* at 732, 86 *S.Ct.* at 1780, 16 *L.Ed.*2d at 891–92.

In *Stovall v. Denno,* 388 *U.S.* 293, 87 *S.Ct.* 1967, 18 *L.Ed.*2d 1199 (1967), the Court focused on the time of the violation, not

---

[1] *See also Tehan v. Shott,* 382 *U.S.* 406, 86 *S.Ct.* 459, 15 *L.Ed.*2d 453 (1966) (denying retroactivity to decisions that were final at the time of the decision in *Griffin v. California,* 380 *U.S.* 609, 85 *S.Ct.* 1229, 14 *L.Ed.*2d 106 (1965) (prosecutor and trial judge may not make adverse comment on defendant's failure to testify)).

the start of the trial, in determining the application of the *Wade/Gilbert* requirement of counsel at pretrial lineups. "*Wade* and *Gilbert* affect only those cases and all future cases which involve confrontations for identification purposes conducted in the absence of counsel after this date." *Stovall,* 388 *U.S.* at 296, 87 *S.Ct.* at 1969, 18 *L.Ed.*2d at 1203. The Court's opinion concisely stated the factors relevant to retroactivity/prospectivity questions: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Id.* at 297, 87 *S.Ct.* at 1970, 18 *L.Ed.*2d at 1203. These considerations became a shorthand test to resolve future cases and were known as the "*Stovall* factors."

While recognizing that the *Wade/Gilbert* requirement sought in part to avoid "unfairness at the trial by enhancing the reliability of the fact-finding process," *id.* at 298, 87 *S.Ct.* at 1970, 18 *L.Ed.*2d at 1204, the Court concluded that the reliance and effect outweighed the purpose and denied retroactive application. As in *Johnson I,* the Court rejected any distinction "between convictions now final . . . and convictions at various stages of trial and direct review." *Id.* at 300, 87 *S.Ct.* at 1972, 18 *L.Ed.*2d at 1205. Observing that "*Wade* and *Gilbert* are, therefore, the only victims of pretrial confrontations in the absence of their counsel to have the benefit of the rules established in their cases," the Court said that this was "an unavoidable consequence of the necessity that constitutional adjudications not stand as mere dictum." *Id.* at 301, 87 *S.Ct.* at 1972, 18 *L.Ed.*2d at 1206.

*Desist v. United States,* 394 *U.S.* 244, 249, 253, 89 *S.Ct.* 1030, 1033, 1035, 22 *L.Ed.*2d 248, 255, 257 (1969), was a turning point. There the Court held that the foremost factor in retroactivity is the purpose of the new constitutional rule, without distinguishing between final convictions and pending appeals. The Court did not apply retroactively *Katz v. United States,* 389 *U.S.* 347, 88 *S.Ct.* 507, 19 *L.Ed.*2d 576 (1967), which stressed the deterrent

purpose of the exclusionary rule on evidence obtained by electronic eavesdropping. Application of the new rule to cases in which the police misconduct had occurred would not advance this purpose, and releasing the prisoners involved would not correct the misconduct. 394 *U.S.* at 249, 89 *S.Ct.* at 1033, 22 *L.Ed.*2d at 255. Furthermore, the exclusionary rule is only a "procedural weapon that has no bearing on guilt" and does not involve "the fairness of the trial." *Id.* at 250, 89 *S.Ct.* at 1034, 22 *L.Ed.*2d at 255 (quoting *Linkletter,* 381 *U.S.* at 638, 639, 85 *S.Ct.* at 1742, 1743, 14 *L.Ed.*2d at 613, 614). But Justice Harlan's dissent forcefully distinguished between cases on collateral and direct review and called for a rethinking of the doctrine and uniform application of new constitutional principles to cases on direct review. *Id.* at 256–69, 89 *S.Ct.* at 1037–44, 22 *L.Ed.*2d at 259–67 (Harlan, J., dissenting).

The Court's division on retroactivity for cases on direct review deepened in *Williams v. United States,* 401 *U.S.* 646, 91 *S.Ct.* 1148, 28 *L.Ed.*2d 388 (1971). *Williams* held that *Chimel v. California,* 395 *U.S.* 752, 89 *S.Ct.* 2034, 23 *L.Ed.*2d 685 (1969) (narrowing the permissible scope of search incident to arrest), would not be applied retroactively even to cases on direct review. The majority continued to adhere to its *Stovall* analysis despite Justice Harlan's eloquent dissent in *Mackey v. United States,* 401 *U.S.* 667, 91 *S.Ct.* 1160, 28 *L.Ed.*2d 404 (1971), the companion case to *Williams.* Justice Harlan stressed that any rule other than retroactivity for cases on direct review would cut the Court loose from the force of precedent, allowing it "to act, in effect, like a legislature, making its new constitutional rules wholly or partially retroactive or only prospective as it deems wise." *Id.* at 677, 91 *S.Ct.* at 1172, 28 *L.Ed.*2d at 411 (Harlan, J., separate opinion). The injustice of

[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule constitute an indefensible departure from this model of judicial review. [*Id.* at 679, 91 *S.Ct.* at 1173, 28 *L.Ed.*2d at 412–13 (Harlan, J., separate opinion).]

Other cases, however, gave full retroactive effect to rules of criminal procedure involving different constitutional guarantees. *See Williams,* 401 *U.S.* at 653, 91 *S.Ct.* at 1152, 28 *L.Ed.2d* at 395 ("[w]here the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function, and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect"). *Cf. Kitchens v. Smith,* 401 *U.S.* 847, 91 *S.Ct.* 1089, 28 *L.Ed.2d* 519 (1971) (*Gideon v. Wainwright,* 372 *U.S.* 335, 83 *S.Ct.* 792, 9 *L.Ed.2d* 799 (1963), granting the right to counsel at all felony trials, must be given full retroactive effect; *cited in Linkletter,* 381 *U.S.* at 639 & n. 20, 85 *S.Ct.* at 1743 & n. 20, 14 *L.Ed.2d* at 614 & n. 20, as one of several cases involving "the fairness of trial—the very integrity of the fact-finding process").

The Court seemed to take a new approach to the retroactivity issue in *Robinson v. Neil,* 409 *U.S.* 505, 93 *S.Ct.* 876, 35 *L.Ed.2d* 29 (1973). Justice Rehnquist, expressing the unanimous view of the Court, limited the *Linkletter* test to what he called procedural questions bearing on the use of evidence or the mode of trial. The Court held that the *Linkletter* three-pronged test was inappropriate for deciding the retroactivity of *Waller v. Florida,* 397 *U.S.* 387, 90 *S.Ct.* 1184, 25 *L.Ed.2d* 435 (1970) (consecutive prosecutions in state and municipal courts violate double jeopardy clause). "The guarantee against double jeopardy is significantly different from procedural guarantees" typically involved in the *Linkletter/Stovall* line of cases, thus retroactivity (even collateral) should be accorded regardless of the outcome of the three-pronged test. *Robinson,* 409 *U.S.* at 509–11, 93 *S.Ct.* at 878–79, 35 *L.Ed.2d* at 33–34.

But in *Michigan v. Payne,* 412 *U.S.* 47, 93 *S.Ct.* 1966, 36 *L.Ed.2d* 736 (1973), the Court applied the *Linkletter* three-pronged test to a retroactivity claim based on a non-procedural issue as defined in *Robinson.* It refused to apply retroactively *North Carolina v. Pearce,* 395 *U.S.* 711, 89 *S.Ct.* 2072, 23 *L.Ed.2d* 656 (1969) (trial judge may not vindictively impose an increased

sentence on retrial after a successful appeal and must state on the record reasons for more severe sentence). Justice Marshall would have applied the rule retroactively, noting that "it is the classification, not the three-pronged test, that determines the result. . . . [I]t might have been thought that *Robinson v. Neil* . . . had begun the task of rationalizing our cases, but apparently that is not so." 412 *U.S.* at 62–63, 93 *S.Ct.* at 1974–1975, 36 *L.Ed.*2d at 749 (Marshall, J., dissenting).[2]

Then in *United States v. Peltier,* 422 *U.S.* 531, 95 *S.Ct.* 2313, 45 *L.Ed.*2d 374 (1975), a divided Court introduced the concept that

> . . . if the law enforcement officers reasonably *believed in good faith* that evidence they had seized was admissible at trial, the "imperative of judicial integrity" is not offended by the introduction into evidence of that material even if decisions subsequent to the search or seizure have broadened the exclusionary rule to encompass evidence seized in that manner. [*Id.* at 537, 95 *S.Ct.* at 2317, 45 *L.Ed.*2d at 381 (emphasis supplied) ].

Justice Rehnquist, writing for the majority, held that the principle of *Almeida-Sanchez v. United States,* 413 *U.S.* 266, 93 *S.Ct.* 2535, 37 *L.Ed.*2d 596 (1973) (invalidating random border patrol stops) does not apply retroactively in light of the officers' reliance on provisions of the Immigration and Naturalization Act of 1952. 422 *U.S.* at 539–42, 95 *S.Ct.* at 2318–20, 45 *L.Ed.*2d at 382–84. In a bitter dissent, Justice Brennan observed that the Court for the first time had denied retroactivity in a case that did not involve a sharp break with the past. *Id.* at 544, 95 *S.Ct.* at 2321, 45 *L.Ed.*2d at 385 (Brennan, J., dissenting).

---

[2]In a later case on retroactivity, *Brown v. Louisiana,* 447 *U.S.* 323, 100 *S.Ct.* 2214, 65 *L.Ed.*2d 159 (1980) (applying *Burch v. Louisiana,* 441 *U.S.* 130, 99 *S.Ct.* 1623, 60 *L.Ed.*2d 96 (1979), prohibiting conviction by nonunanimous six-person jury), the Supreme Court adhered to the *Stovall* factors. The Court emphasized that retroactivity is not determined mechanically, but each rule of constitutional criminal procedure must be viewed according to "its own distinct functions, its own background of precedent, and its own impact on the administration of justice." 447 *U.S.* at 327, 100 *S.Ct.* at 2219, 65 *L.Ed.*2d at 165 (quoting *Johnson I,* 384 *U.S.* at 728, 86 *S.Ct.* at 1778, 16 *L.Ed.*2d at 889).

Applying these precedents, this Court considered in 1980 the retroactivity of *Prouse* (invalidating random police stops for credential checks). *Carpentieri,* 82 *N.J.* at 548–49.[3] Not surprisingly, the *Carpentieri* court split 4–3. The majority held that (1) the principles of deterrence underlying *Prouse* would not be furthered by retroactive application; (2) law enforcement officials had relied upon then long-standing legal authority; and (3) retroactive application of *Prouse* would encumber an already overburdened judiciary and would operate only to the detriment of the administration of justice. It thus ruled that *Prouse* applied only when the stop occurred after the date of its decision, March 27, 1979. Justice Clifford cited this language from *Peltier* for the majority:

It is indisputable, however, that in every case in which the [Supreme] Court has addressed the retroactivity problem in the context of the exclusionary rule, whereby concededly relevant evidence is excluded in order to enforce a constitutional guarantee that does not relate to the integrity of the factfinding process, the Court has concluded that any such new constitutional principle would be

---

[3]In *State v. Nash,* 64 *N.J.* 464, 469–70 (1974), this Court identified four approaches to the applicability of a new rule of law: strict prospectivity, general retroactivity, and two forms of limited retroactivity, one applying the new rule only to the parties to the overruling case and the other applying it to the overruling case and all other cases thereafter pending on direct review. In *Nash,* it applied the *Linkletter/Stovall* three-pronged test in determining which approach to adopt in a given case. The competing considerations "are weighed by examining (1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." *Id.* at 471. *Nash* held that the new rule of *State v. DeBonis,* 58 *N.J.* 182 (1972) (defendant appealing a municipal court conviction may not receive a greater sentence in the county court) should apply retroactively to all cases pending on direct appeal on the date of that decision.

In *State v. Howery,* 80 *N.J.* 563 (1979), applying the same tests, the Court held that *Franks v. Delaware,* 438 *U.S.* 154, 98 *S.Ct.* 2674, 57 *L.Ed.2d* 667 (1978) (mandating veracity challenges of search warrants based on allegedly false affidavits) would apply only prospectively to search warrants issued after the *Franks* decision.

The Court has since restated its acceptance of these general principles. *State v. Burstein,* 85 *N.J.* 394, 402–03 (1981); *see also State v. Czachor,* 82 *N.J.* 392, 408–10 (1980).

accorded only prospective application. [82 *N.J.* at 551 (quoting *Peltier,* 422 *U.S.* at 535, 95 *S.Ct.* at 2316, 45 *L.Ed.2d* at 380) ].

Justice Pashman forcefully advanced for the minority the position of the Brennan dissent in *Peltier* and the Harlan dissents and separate opinion in *Desist, Mackey,* and *Williams.* 82 *N.J.* at 556–73 (Pashman, J., dissenting).

Neither side was able to predict that two years later the Supreme Court would essentially abandon the *Stovall* analysis and adopt Justice Harlan's view. But that is what happened and what has undermined the logic of *Carpentieri.*

II

In *United States v. Johnson,* 457 *U.S.* 537, 102 *S.Ct.* 2579, 73 *L.Ed.2d* 202 (1982) (hereinafter *Johnson II* ), the Supreme Court abandoned, except in the "clear break" cases, the *Stovall* factors and "embrace[d] Justice Harlan's views in *Desist* and *Mackey.*" It held that "a decision of this Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered." *Id.* at 562, 102 *S.Ct.* at 2594, 73 *L.Ed.2d* at 222. The Court stressed that this new principle applied only to Fourth Amendment exclusionary rule issues. *Id.*

It excluded from the new principle three classes of cases in which the courts should determine retroactivity "through application of a threshold test." *Id.* at 548, 102 *S.Ct.* at 2587, 73 *L.Ed.2d* at 213.

Those three classes excepted are:

First, when a decision of this Court merely has applied settled precedents to new and different factual situations, no real question has arisen as to whether the later decision should apply retrospectively. In such cases, it has been a foregone conclusion that the rule of the latter case applies in earlier cases, because the later decision has not in fact altered that rule in any material way. [Citations].

[Second,] [c]onversely, where the Court has expressly declared a rule of criminal procedure to be "a clear break with the past," *Desist v United States,* 394 US, at 248, 22 L Ed 2d 248, 89 S Ct 1030 [at 1033], it almost invariably has gone on to find such a newly-minted principle nonretroactive. [Citation]. In

this second type of case, the traits of the particular constitutional rule have been less critical than the Court's express threshold determination that the " 'new' constitutional interpretatio[n] ... so change[s] the law that prospectivity is arguably the proper course." [Citation]. Once the Court has found that the new rule was unanticipated, the second and third Stovall factors—reliance by law enforcement authorities on the old standards and effect on the administration of justice of a retroactive application of the new rule—have virtually compelled a finding of nonretroactivity. [Citations].

Third, the Court has recognized full retroactivity as a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place.... [E.g.,] Robinson v. Neil, 409 US, at 509, 35 L Ed 2d 29, 93 S Ct 876 [at 878] (double jeopardy). [Id. at 548, 102 S.Ct. at 2587, 73 L.Ed.2d at 213–14].

We must first apply the three classifications in the threshold test to *Prouse.* I conclude that *Prouse* "neatly fits none of these three categories." *Johnson II,* 457 *U.S.* at 551, 102 *S.Ct.* at 2588, 73 *L.Ed.2d* at 214. *Prouse* did not apply settled precedents to new and different factual situations,[4] nor did it involve a lack of jurisdiction.

Conversely, *Prouse* did not "expressly overrule[ ] clear past precedent[s] of this Court on which litigants may have relied. Nor did [it] disapprove an established practice that the Court had previously sanctioned." *Johnson II,* 457 *U.S.* at 552, 102 *S.Ct.* at 2588–89, 73 *L.Ed.2d* at 215. On this score, I agree wholeheartedly with Justice Pashman's forceful dissent in *Carpentieri* in which the Chief Justice and Justice Sullivan joined.

Applying this threshold analysis to the case before us, it can be seen that *Delaware v. Prouse, supra,* did not state a new constitutional doctrine in "sharp break" with the past. Prior to the random stop at issue—which occurred on November 13, 1976—the Supreme Court had already decided *United States v. Brignoni-Ponce, supra.* That case held that the practice by roving border patrol

---

[4]The Supreme Court had expressly reserved the issue of automobile license and registration checks in *United States v. Martinez-Fuerte,* 428 *U.S.* 543, 560 n. 14, 96 *S.Ct.* 3074, 49 *L.Ed.2d* 1116, 1130 n. 14 (1976) and *United States v. Brignoni-Ponce,* 422 *U.S.* 873, 883 n. 8, 95 *S.Ct.* 2574, 2581 n. 8, 45 *L.Ed.2d* 607, 618 n. 8 (1975). In *Johnson II,* the Supreme Court held that when the question has been "expressly left open in a number of [its] prior opinions," 457 *U.S.* at 551, 102 *S.Ct.* at 2588, 73 *L.Ed.2d* at 214, it cannot be held to be a simple application of settled precedent to new facts.

agents of stopping without cause any vehicle near the international border violated the Fourth Amendment. The Court's reasoning in *Brignoni-Ponce* began with the following general statement of the law of search and seizure:

> The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. *Davis v. Mississippi,* 394 *U.S.* 721, 89 *S.Ct.* 1394, 22 *L.Ed.2d* 676 (1969); *Terry v. Ohio,* 392 *U.S.* 1, 16–19, 88 *S.Ct.* 1868, [1877], 20 *L.Ed.2d* 889 (1968). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person," *Terry v. Ohio,* supra, at 16, 88 *S.Ct.* 1868 [at 1877], 20 *L.Ed.2d* 889, and the Fourth Amendment requires that the seizure be "reasonable." As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. *Terry v. Ohio,* supra, at 20–21, 88 *S.Ct.* 1868 [at 1879–80], 20 *L.Ed.2d* 889; *Camara v. Municipal Court,* 387 *U.S.* 523, 536–537, 87 *S.Ct.* 1727 [1734], 18 *L.Ed.2d* 930 (1967). [422 *U.S.* at 878, 95 *S.Ct.* at 2578–2579, 45 *L.Ed.2d* at 614].

> Based on these general principles, the Court found a requirement of "reasonable suspicion" falling short of probable cause protected both the interests of the public in law enforcement and of border residents in personal privacy. See *id.* [422 *U.S.*] at 883, 95 *S.Ct.* at 2581, 45 *L.Ed.2d* at 617.

> Although the decision in *Brignoni-Ponce* expressly reserved consideration of the limits of official discretion in making spot checks of licenses and registrations, see *id.* at 883 n. 8, 95 *S.Ct.* at 2581 n. 8, 45 *L.Ed.2d* at 618; see also *United States v. Martinez-Fuerte,* 428 *U.S.* 543, 560 n. 14, 96 *S.Ct.* 3074, 3084 n. 14, 49 *L.Ed.2d* 1116 (1976), the Court's decision in *Prouse* was clearly not a "sharp break" with prior law. [82 *N.J.* at 560–61].

Justice Brennan has catalogued the precedents that best mark "the 'avulsive change [in] the current of the law' required" to define a clear break. *Peltier,* 422 *U.S.* at 547 & n. 5, 95 *S.Ct.* at 2322 & n. 5, 45 *L.Ed.2d* at 387 & n. 5 (Brennan, J., dissenting). (Appendix I). If anything, rather than changing course, the current of the law was moving inexorably toward the *Prouse* result. Justice Rehnquist recently described this continuity in *United States v. Villamonte-Marquez,* —— *U.S.* ——; ——, 103 *S.Ct.* 2573, 2580, 77 *L.Ed.2d* 22, ——, 51 *U.S.L.W.* 4812, 4814 (1983):

> The difference in outcome between the roving patrol stop in *Brignoni-Ponce, supra,* and the fixed checkpoint stop in *Martinez-Fuerte, supra,* was due in part to what the Court deemed the less intrusive and less awesome nature of fixed checkpoint stops when compared to roving patrol stops. And the preference for

roadblocks as opposed to random spot checks expressed in *Delaware v. Prouse, supra,* reflects a like concern.

The majority's suggestion that *Prouse,* in the language of *Johnson II,* "disapprove[d] a practice [the Supreme] Court arguably has sanctioned" or "overturn[ed] a longstanding and widespread practice to which [the Supreme] Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved," 457 *U.S.* at 551, 102 *S.Ct.* at 2588, 73 *L.Ed.2d* at 215, cannot be sustained. First, where I come from, "near-unanimous" means something more than 16 out of 26 states, or barely 60%. Although "[t]he battle of the string citations can have no winner," *Smith v. Wade,* —— *U.S.* ——, ——, 103 *S.Ct.* 1625, 1659, 75 *L.Ed.2d* 632, 674 (1983) (O'Connor, J., dissenting), it is worth noting that of the authorities relied upon by the majority, many are distinguishable in either fact or law. (Appendix II). But more important than numbers is that the path of the law was moving toward the *Prouse* result foreshadowed by *Brignoni-Ponce* and *Martinez-Fuerte,* both of which distinguished between a recognized checkpoint for credentials and a random stop.

After the 1975 decision in *Brignoni-Ponce,* Illinois ruled that a random stop must be based upon a well founded suspicion, even citing *Brignoni-Ponce* as authority for the proposition. *People v. James,* 44 *Ill.App.*3d 300, 3 Ill.Dec. 88, 358 *N.E.*2d 88 (1976). A divided Kansas court upheld a random stop, recognizing that there was a "split of authority," but placing no reliance on *Brignoni-Ponce. Overland Park v. Sandy,* 2 *Kan.App.*2d 176, 179, 576 *P.*2d 1097, 1100, aff'd, 225 *Kan.* 102, 587 *P.*2d 883 (1978). Nebraska upheld a random stop based upon prior precedent but the dissent noted that the authority relied upon "is now doubtful." *State v. Kretchmar,* 201 *Neb.* 308, 314, 267 *N.W.*2d 740, 744 (1978) (C. Thomas White, J., dissenting) (majority relies on *State v. Holmberg,* 194 *Neb.* 337, 231 *N.W.*2d 672 (1975), in which case the dissent had pointed out that footnote 8 of

*Brignoni-Ponce* dealt only with fixed point stops.)[5] Finally, Delaware underscored the point that there was no arguable approval of the practice by invalidating a random stop without even mentioning *Brignoni-Ponce* or *Martinez-Fuerte.* *State v. Prouse,* 382 *A.*2d 1359 (Del.Sup.1978).[6]

### III.

Given this steady movement in the law toward invalidating random stops, I cannot view *Prouse* as an avulsive change in the course of the law. In some ways, I wish that I could, because there is an element of unfairness in affording these defendants the *Prouse* rule. The only reason that the judgments under review are not already final is that the trial court reserved decision on their motion to afford these defendants equal treatment with Carpentieri.

Except to the parties, the issue, then, is not of great moment. There are few, if any, remaining cases of retroactive application

---

[5]Fortunately for Kretchmar, Nebraska did not view *Prouse* as a clear break case. Subsequent to the date of the decision in *Prouse,* the Supreme Court granted *certiorari,* vacated the judgment of the Nebraska Supreme Court and remanded the case for further consideration in light of *Prouse.* 440 *U.S.* 978, 99 *S.Ct.* 1783, 60 *L.Ed.*2d 237 (1979). The Nebraska Supreme Court withdrew its opinion, found *Prouse* to be applicable—without mention of retroactivity—and remanded to the trial court with instructions to dismiss. 203 *Neb.* 663, 280 *N.W.*2d 46 (1979). The injustice of the majority's position on mainstream retrospectivity is best illustrated by the reverse hypothetical of *Kretchmar.* A litigant who was *successful* in a lower court challenge of a random stop would be stripped of the result because, under the majority's theory, "an inferior court errs when it arrives at a result which [the Supreme Court] subsequently adopts but later decides must operate prospectively only." *Mackey,* 401 *U.S.* at 680, 91 *S.Ct.* at 1173, 28 *L.Ed.*2d at 413 (Harlan, J., separate opinion).

[6]On the federal side, *United States v. Montgomery,* 561 *F.*2d 875 (D.C.Cir. 1977), did not read *Brignoni-Ponce* or *Martinez-Fuerte* as implied authority for random stops without suspicion. *See also United States v. Harris,* 528 *F.* 2d 1327 (8th Cir.1975) (seizure must be assessed on articulable facts). *But see United States v. Jenkins,* 528 *F.*2d 713 (10th Cir.1975) (relying on n. 8 of *Brignoni-Ponce* ).

of *Prouse.* Still, I believe it is our duty to apply the Supreme Court's precedents in accordance with their spirit. A majority of state courts have already applied *Prouse* retroactively or would do so without explicit treatment of the issue. *See State v. Conger,* 183 *Conn.* 386, 439 *A.2d* 381, 384 (1981); *Casal v. State,* 375 *So.2d* 1077 (Fla.App.1979); *State v. Hilleshiem,* 291 *N.W.2d* 314, 317–19 (Iowa 1980); *State v. Tucker,* 286 *Or.* 485, 595 *P.2d* 1364 (1979); *State v. Morris,* 56 *Or.App.* 97, 641 *P.2d* 77, 80–81 (1982); *State v. Roberts,* 434 *A.2d* 257, 260 (R.I.1981); *Hughes v. State,* 588 *S.W.2d* 296 (Tenn.1979); *State v. Boswell,* 294 *S.E.2d* 287, 294 (W.Va.1982). *Contra Luckett v. State,* 586 *S.W.2d* 524 (Tex.Cr.App.1979). We should do likewise.

I would reverse the judgments below.

## APPENDIX I

In *Peltier,* Justice Brennan analyzed the precedents on clear break prospectivity:

> Most cases where the [Supreme] Court has ordained prospective application of a new rule of criminal procedure have involved decisions which explicitly overruled a previous decision of this Court. See *Linkletter v Walker,* 381 US 618, 14 L Ed 2d 601, 85 S Ct 1731 (1965), involving the retroactivity of *Mapp v Ohio,* 367 US 643, 6 L Ed 2d 1081, 81 S Ct 1684, 84 ALR2d 933 (1961), which had overruled *Wolf v Colorado,* 338 US 25, 93 L Ed 1782, 69 S Ct 1359 (1949); *Williams v United States,* 401 US 646, 28 L Ed 2d 388, 91 S Ct 1148 (1971), involving the retroactivity of *Chimel v California,* 395 US 752, 23 L Ed 2d 685, 89 S Ct 2034 (1969), which overruled *United States v Rabinowitz,* 339 US 56, 94 L Ed 653, 70 S Ct 430 (1950), and *Harris v United States,* 331 US 145, 91 L Ed 1399, 67 S Ct 1098 (1947); *Fuller v Alaska,* 393 US 80, 21 L Ed 2d 212, 89 S Ct 61 (1968) (per curiam), involving the retroactivity of *Lee v Florida,* 392 US 378, 20 L Ed 2d 1166, 88 S Ct 2096 (1968), which overruled *Schwartz v Texas,* 344 US 199, 97 L Ed 231, 73 S Ct 232 (1952); *Desist v United States,* 394 US 244, 22 L Ed 2d 248, 89 S Ct 1030 (1969), involving the retroactivity of *Katz v United States,* 389 US 347, 19 L Ed 2d 576, 88 S Ct 507 (1967), which specifically rejected *Goldman v United States,* 316 US 129, 86 L Ed 1322, 62 S Ct 993 (1942), and *Olmstead v United States,* 277 US 438, 72 L Ed 944, 48 S Ct 564, 66 ALR 376 (1928); *Tehan v United States ex rel. Shott,* 382 US 406, 15 L Ed 2d 453, 86 S Ct 459 (1966), involving the retroactivity of *Griffin v California,* 380 US 609, 14 L Ed 2d 106, 85 S Ct 1229 (1965), which overruled *Twining v New Jersey,* 211 US 78, 53 L Ed 97, 29 S Ct 14 (1908); *Daniel v Louisiana,* 420 US 31, 42 L Ed 2d 790, 95 S Ct 704 (1975), involving the retroactivity of *Taylor v Louisiana,* 419 US 522, 42 L Ed 2d 690, 95 S Ct 692 (1975), which specifically disapproved *Hoyt v Florida,* 368 US 57,

7 L Ed 2d 118, 82 S Ct 159 (1961). [*Peltier*, 422 *U.S.* at 547 n. 5, 95 *S.Ct.* at 2322–23 n. 5, 45 *L.Ed.*2d at 387 n. 5 (Brennan, J., dissenting)].

He also listed three cases of prospectivity in which the over-ruled practice had, at least arguably, been sanctioned previously by the Court. In those cases the point was quite clear. In *Johnson v. New Jersey,* 384 *U.S.* 719, 731, 86 *S.Ct.* 1772, 1780, 16 *L.Ed.*2d 882, 891 (1966), the Court stated:

... Prior to *Escobedo* and *Miranda,* however, we had expressly declined to condemn an entire process of in-custody interrogation solely because of such conduct by the police. See *Crooker v California,* 357 US 433, 2 L ed 2d 1448, 78 S Ct 1287 (1958); *Cicenia v Lagay,* 357 US 504, 2 L ed 2d 1523, 78 S Ct 1297 (1958). Law enforcement agencies fairly relied on these prior cases, now no longer binding, in obtaining incriminating statements during the intervening years preceding Escobedo and Miranda.

In *Gosa v. Mayden,* 413 *U.S.* 665, 673, 93 *S.Ct.* 2926, 2932–33, 37 *L.Ed.*2d 873, 883–84 (1973), Justice Blackmun wrote in the plurality opinion:

... The Court long and consistently had recognized that military status in itself was sufficient for the exercise of court-martial jurisdiction. *Kinsella v Singleton,* 361 US 234, 240–241, 243, 4 L Ed 2d 268, 80 S Ct 297 [300–01, 302] (1960); *Reid v Covert,* 354 US 1, 22–23, 1 L Ed 2d 1148, 77 S Ct 1222 [1233–34] (1957); *Grafton v United States,* 206 US 333, 348, 51 L Ed 1084, 27 S Ct 749 [752] (1907); *Johnson v Sayre,* 158 US 109, 114, 39 L Ed 914, 15 S Ct 773 [775] (1895); *Smith v. Whitney,* 116 US 167, 184–185, 29 L Ed 601, 6 S Ct 570 [579] (1886); *Coleman v. Tennessee,* 97 US 509, 24 L Ed 1118 (1879); *Ex parte Milligan,* 4 Wall 2, 123, 18 L Ed 281 (1866).

In *Adams v. Illinois,* 405 *U.S.* 278, 283–84, 92 *S.Ct.* 916, 919–20, 31 *L.Ed.*2d 202, 208–09 (1972), the Court stated:

... We do not think that law enforcement authorities are to be faulted for not anticipating *Coleman.* There was no clear foreshadowing of that rule. A contrary inference was not unreasonable in light of our decisions in *Hamilton v Alabama,* 368 US 52, 7 L Ed 2d 114, 82 S Ct 157, and *White v Maryland,* 373 US 59, 10 L Ed 2d 193, 83 S Ct 1050 (1963). . . . Many state courts not unreasonably regarded Hamilton and White as fashioning limited constitutional rules governing preliminary hearings. See, e.g., the decision of the Illinois Supreme Court in *People v. Morris,* 30 Ill 2d 406, 197 NE2d 433. Moreover, a number of courts, including all of the federal courts of appeals had concluded that the preliminary hearing was not a critical stage entitling an accused to the assistance of counsel. [Footnote]. It is thus clear there has been understandable and widespread reliance upon this view by law enforcement officials and the courts.

48

## APPENDIX II

Of the eight circuit court cases cited by the majority, *ante* at 30, as upholding the constitutionality of random stops for license checks, only two indisputably stand for that proposition. *Myricks v. United States,* 370 *F.*2d 901 (5th Cir.), *cert.* dism., 386 *U.S.* 1015, 87 *S.Ct.* 1366, 18 *L.Ed.*2d 474 (1967); *Lipton v. United States,* 348 *F.*2d 591 (9th Cir.1965). In a later Ninth Circuit case, however, the court noted that *Lipton* had been limited to stops "to enforce laws susceptible of no other means of effective enforcement" and would not apply to a stop of 1970–74 Ford LTD's (not truly a random stop) to detect stolen vehicles when there was no showing of lack of effective alternate enforcement and no "founded suspicion." *United States v. Carrizoza-Gaxiola,* 523 *F.*2d 239, 241 (9th Cir.1975). In two other cited cases, the police had articulable suspicion supporting the stops. *United States v. Kelley,* 462 *F.*2d 372 (4th Cir.1972) (police had placed vehicle under surveillance based on informant's tip); *United States v. Berry,* 369 *F.*2d 386 (3d Cir.1966) (car had stopped at successive green lights while its occupants looked around but did not seek directions from policeman standing nearby). The two Tenth Circuit cases, *United States v. Jenkins,* 528 *F.*2d 713 (10th Cir.1975), and *United States v. Lepinski,* 460 *F.*2d 234 (10th Cir.1972), construing New Mexico law, were later expressly repudiated by the New Mexico Court of Appeals. *State v. Ruud,* 90 *N.M.* 647, 649–50, 567 *P.*2d 496, 498–99 (1977). Finally, the Eighth Circuit, in the same year as *United States v. Turner,* 442 *F.*2d 1146 (8th Cir.1971), cited by the majority, expressly reserved the constitutional issues arising from random stops. *United States v. Nicholas,* 448 *F.*2d 622, 626 (8th Cir.1971) (distinguishing *Turner* because in that case parties had not questioned power of police to stop). Later, that Circuit stated that automobile stops must be supported by articulable suspicion. *United States v. Harris,* 528 *F.*2d 1327 (8th Cir.1975).

Analysis of the twenty-six state court cases cited by the majority, *ante* at 30–32, also reveals that eleven of them do not involve true random stops.

In eight cases, the police had articulable suspicion, on the facts, to justify a stop. *People v. Nunn,* 264 *Cal.App.*2d 919, 70 *Cal.Rptr.* 869 (1968) (police had suspicion of revoked license; stopped driver in his own driveway); *Byrd v. State,* 80 *So.*2d 694 (Fla.1955) (police were informed that truck contained contraband whiskey); *Smith v. State,* 155 *So.*2d 826 (Fla.App.1963), *cert.* dism., 157 *So.*2d 815 (Fla.1963) (without opinion), *cert.* dism., 167 *So.*2d 225 (Fla.1964) (with opinions) (police suspected defendant's license had been revoked); *Brisbane v. State,* 233 *Ga.* 339, 211 *S.E.*2d 294 (1974) (at 3:45 A.M. on same night as another gas station robbery, police saw car go slowly by gas station as though occupants were "casing" it); *Morgan v. Heidelberg,* 246 *Miss.* 481, 150 *So.*2d 512 (1963) (defendant turned around rather than approach checkpoint that was stopping every car); *State v. Rankin,* 477 *S.W.*2d 72 (Mo.1972) (police saw car speed out of high-crime parking area upon their approach, and officers observed passenger reaching under seat as though hiding something); *State v. Gray,* 59 *N.J.* 563 (1971) (police saw defendant make several very brief stops at same bar over course of five hours); *State v. Allen,* 282 *N.C.* 503, 194 *S.E.*2d 9 (1973) (at 2:00 A.M. police saw defendants scurry from behind buildings into bushes and then drive off).

Three other cited cases are inapposite for other reasons. *Kinard v. State,* 335 *So.*2d 924 (Ala.1976) (court expressly did not decide issue); *People v. James,* 44 *Ill.App.*3d 300, 3 Ill.Dec. 88, 358 *N.E.*2d 88 (1976) (court required "founded suspicion" for stops); *Kansas City v. Fulton,* 533 *S.W.*2d 677 (Mo.App.1976) (not a credentials check case; police asked occupant of parked car for identification upon report of prowler in area).

Finally, one case that did uphold the legality of random stops acknowledged "a split of authority" in other states. *Overland Park v. Sandy,* 2 *Kan.App.*2d 176, 179, 576 *P.*2d 1097, 1100, aff'd, 225 *Kan.* 102, 587 *P.*2d 883 (1978); *see also State v. Kretchmar,* 201 *Neb.* 308, 314, 267 *N.W.*2d 740, 744–45 (1978) (C. Thomas White, J., dissenting) (noting significant and contemporary authority invalidating random stops); *State v. Holmberg,* 194 *Neb.*

337, 349, 231 *N.W.*2d 672, 679 (1975) (McCown, J., dissenting) (observing that cases invalidating random stops "are not only more numerous, but far more persuasive").

The remaining cases upheld random stops generally, though most stressed that the stop must be neither "a mere subterfuge," *People v. Harr,* 93 *Ill.App.*2d 146, 150, 235 *N.E.*2d 1, 2 (1968), nor "fishing expeditions," *Faulkner v. State,* 549 *S.W.*2d 1, 2 (Tex.Cr.App.1976).

Chief Justice Wilentz joins in this opinion.